[No. 25476.   Department One.   June 25, 1935.]

UNITED PACIFIC CASUALTY INSURANCE COMPANY, *Respondent*, v. THE PORT OF EVERETT *et al.*, *Appellants*, CHARLES R. WATTS & COMPANY, *Respondent*.[1]

[1]Reported in 46 P. (2d) 736.

*F. W. Mansfield* and *Black & Rucker,* for appellant Port of Everett.

*Hyland, Elvidge & Alvord,* for appellant Shell Oil Co.

*Ballinger, Hutson & Boldt,* for respondent United Pacific Casualty Insurance Co.

*Schwellenbach & Gates,* for respondent Charles R. Watts & Co.

GERAGHTY, J.—The port of Everett made a contract with James N. Main, by the terms of which Main agreed to furnish and put in place approximately ten thousand tons of rock rip-rap on Tract O fill in the harbor of Everett. After the placing of this quantity of rock, the contractor, under a supplemental agreement with the port, furnished and put in place somewhat more than ten thousand additional tons of rock. The work was formally accepted by the port May 1, 1933, and a final estimate allowed the contractor.

Thereafter and within the thirty days allowed by statute, claims were filed against the contractor and his bond for labor and material, aggregating approxi-

mately six thousand dollars, or considerably more than the retained percentage due the contractor. Thereupon, the plaintiff, United Pacific Casualty Insurance Company, surety on the contractor's bond, instituted this action against the port, the contractor, and all claimants for labor and material, seeking to have the respective rights and liabilities of all parties concerned adjudicated by the court.

The essential facts, as they appear from the record, are as follows: The contract, made August 13, 1932, provided for the delivery and placing of approximately ten thousand tons of rock at an agreed price of $1.23 per ton. As to the manner of payment, it was stipulated:

"Estimates of the work completed shall be made by the Engineer each month. During the time allowed in the contract for the completion of the work and on or about the 17th day of the month following the issuance of the estimate, the Port Commission shall deliver to the contractor a warrant upon ............................ Construction Fund in an amount equal to eighty-five (85%) per cent of such estimate, and the balance of said contract price, being fifteen (15%) per cent of such estimate, shall be retained for a period of thirty (30) days after the final completion of the improvement, and no improvement shall be deemed completed until the same is approved and declared completed by the Port Commission. . . . No payment shall be issued to the contractor in any event for any part of said fifteen (15%) per cent reserve until the Engineer shall certify to the Port Commission that the thirty (30) days following the final acceptance of said improvement or work have elapsed, and that no uncompleted or defective work has been discovered for which the Port makes claim."

The contractor gave a performance bond in the sum of $12,300, which the plaintiff executed as surety. Installation of the rock provided for in the contract was completed about January 16, 1933. February 6, 1933,

the port made a supplemental agreement with the contractor for delivery of approximately four thousand additional tons of rock, at an increase of ten per cent over the price stipulated in the original contract. The supplemental agreement made reference to the former contract and recited that 10,300 tons of rock had been delivered pursuant to its terms, and that approximately four thousand tons, in addition to the amount already delivered, would be required for the work, and provided for the delivery and placing of this additional quantity by the contractor. The supplemental agreement contained the following stipulation:

"It is further agreed that that certain bond for the sum of Twelve Thousand Three Hundred ($12,300.00) Dollars given by the said contractor as Principal and executed by the United Pacific Casualty Insurance Company as Surety guaranteeing the performance of the contract shall be continued in full force and effect until the completion of this supplemental agreement, and the said surety agrees to be bound by the terms of this supplemental agreement."

The supplemental agreement was approved in writing by the plaintiff surety company.

The quantity of rock—four thousand tons—provided for in the supplemental agreement having been delivered and placed by the contractor, it was found that additional rock would be required, and on March 4, 1933, the commissioners of the port made an order, entered upon the minutes, "that approximately 2,500 tons, or enough rock to finish the west face of Tract O, be placed," and the port's attorney was instructed to arrange for continuation of the contractor's bond to cover this additional rock. The consent of the bonding company to the delivery by the contractor of rock in addition to the four thousand tons provided for in the supplemental agreement was never obtained by the port. Ten thousand and ninety-one tons were deliv-

ered by the contractor in addition to the quantity delivered under the original contract, being 6,091 tons more than the quantity stipulated in the supplemental agreement consented to and approved by the surety.

The minutes of the port district show that, on February 6, 1933, the contractor requested a payment of fifteen hundred dollars on account of rock delivered under the original contract, payable out of the retained percentage. The port agreed to pay this sum, conditioned upon the contractor furnishing a letter from the surety releasing the port from all liability for unpaid outstanding obligations incurred under the contract. The port also addressed a letter to the surety saying that it was willing to pay the contractor, as requested, with its consent. The surety did not reply to this letter or otherwise give its consent to the payment, but the port, nevertheless, made the requested payment to the contractor.

The trial court reached the conclusion that the liability of the surety was limited to claims growing out of the original and supplemental agreements, and that it was not liable for the claims of laborers and materialmen arising out of the six thousand odd tons supplied in addition to the quantities of rock specifically covered by the agreements. The court also found that the port had improperly paid the contractor fifteen hundred dollars out of the retained fund provided for in the original contract, and considered the rights of the parties as if that sum were still in the fund. The court allowed unpaid claims aggregating $1,140.61 arising out of the work done under the original and supplemental agreements, and $4,589.62 on account of the last 6,091 tons, not supplied under the agreements.

After the payment of the fifteen hundred dollars to the contractor, there remained in the retained fund, available for the payment of claims arising out of the

original and supplemental agreements, $1,212.77, and in the retained fund for the rock delivered subsequent to the agreements, $1,233.55. It will be seen that the fund actually retained on account of the original and supplemental agreements, even after the payment of the fifteen hundred dollars to the contractor, was sufficient to pay all of the claims arising out of that part of the work and allowed by the court.

But the Shell Oil Company, one of the defendant claimants, filed a claim on account of oil and gas, furnished to the contractor in the prosecution of the work, in the sum of $1,779.35. Of this claim, $1,198.27 was allowed by the court and charged to the work done subsequent to the agreements. The rest of the claim, being for supplies furnished in the performance of work under the agreements, was disallowed by the court, for the reason that the claimant had been paid by the contractor $585, which the claimant had credited to a prior indebtedness of the contractor.

As the retained fund was not sufficient to pay all of the claims allowed arising out of the delivery of the last 6,091 tons of rock, the claimants were awarded judgment against the port for the difference, pursuant to Rem. Rev. Stat. § 1160 [P. C. § 9726], which provides that, where a municipal corporation fails to take a bond as required, it shall be liable to claimants for labor and material supplied to the contractor.

The port and the Shell Oil Company have appealed from the judgment of the trial court.

The port contends that, under the supplemental agreement, the contractor was obligated to supply all additional rock needed to furnish the rip-rapping of Tract O, and that the obligation of the surety was co-extensive with that of the contractor. The surety contends that its liability extends only to the installation of the fourteen thousand odd tons of rock specifically

referred to in the original and supplemental agreements. If the port's contention is correct, the surety is liable for all of the valid claims in excess of the retained percentage. On the other hand, if the position of the surety company is correct, its liability is limited to the payment of claims arising out of the original and supplemental agreements in excess of the retained percentage.

■■■ A consideration of the record leads us to the conclusion that the trial court was correct in holding that the liability of the surety did not cover the claims arising out of the delivery of the last 6,091 tons. While the printed specifications had general provisions for extra work, these provisions are not applicable to the contract. The original call for bids was for "the furnishing, delivery and placing of approximately 10,000 tons of rock rip-rap on Tract O fill in the harbor of Everett," and the contractor's tender was for furnishing and delivering in place "approximately 10,000 tons of rock rip-rap." A like description of the work to be done was contained in the contract and bond. Section 36 of the specifications was as follows:

"QUANTITY OF MATERIAL. It is estimated that approximately 10,000 short tons will be required to cover the proposed work."

The supplemental agreement recites:

"It is found necessary in order to complete the work contemplated by said contract to deliver approximately 4,000 tons, in addition to the amount already delivered, of rock rip-rap."

While the figure "4,000" was qualified by the word "approximately," it would seem unreasonable to hold that 10,091 tons approximates 4,000 tons, where the liability of the surety is in issue. Essentially, the contract and supplemental agreement did not contemplate the doing of all the rip-rapping required on Tract O,

but the placing of a specified quantity of rock rip-rap on that tract.

The port also contends that the payment of fifteen hundred dollars to the contractor out of the reserved percentage after the quantity required by the original contract had been supplied was not a breach of its agreement to retain fifteen per cent of the contract price. This contention is based upon the claim that the first contract had been completed and accepted. This contention is untenable, because there was no formal acceptance of the work as completed, by the port, until the resolution of May 1, 1933. Furthermore, the original contract is tied into the supplemental agreement, so that they are, in effect, one contract. The contract specifically provides that the balance of the contract price, being fifteen per cent, shall be retained for a period of thirty days after final completion of the improvement, "and no improvement shall be deemed completed until the same is approved and declared completed by the port commission."

We now consider the appeal of the Shell Oil Company.

Prior to his contract with the port, Main had completed another contract, referred to in the record as the Bremerton job. The Shell Oil Company had supplied material for this job, for which it had not been paid in full by the contractor. After entering upon the port's job, Main paid the Shell company $585, which was applied by the company on the pre-existing debt arising out of the Bremerton job. Whether the money so paid did, in fact, all come from the Everett job, was in dispute, as were other facts in relation to the transaction. The trial court found that the money paid by Main to the Shell company had been received by him from the port, and that the company had credited the amount upon the pre-existing debt,

charged with knowledge of the source from which the money came. Upon this finding, the court concluded that the payment should be treated as having been made on account of the port job, and disallowed that much of the company's claim both as against the surety and the port.

We think the evidence supports the court's finding as to the source from which the money was received, and that the Shell company was charged with knowledge of the fact. We also think the court correctly held, as a matter of law, that, as against the surety and the port, the Shell company was not entitled to a second payment of the $585 received by it from port funds.

In *Crane Co. v. Pacific Heat & Power Co.*, 36 Wash. 95, 78 Pac. 460, where the court had under consideration facts quite similar to those before us, it is said:

"It will be seen that the question for decision here is whether the appellant, the Aetna Indemnity Company, is equitably entitled to have the payments which were made to the Pacific Heat & Power Company, under the Warren avenue school contract, applied to the indebtedness of the Warren avenue school, for which the indemnity company is surety, or whether the respondent could apply them to other and older indebtedness, for which the indemnity company was in no wise responsible, and which was unsecured. We think, under both authority and right reasoning, that the indemnity company had an equitable right to have the money which was paid to the respondent by its principals on the bond applied to the liquidation of the debt for which the security was given. The Aetna Indemnity Company did not undertake to secure the payment to the respondent of any old claims which were then due and unsecured, or any claims other than the one which was the subject of the contract, viz., the Warren avenue school contract. It cannot be gainsaid that, as a general rule, a surety has no right to direct the application of a payment made by its principal;

but this case falls without, rather than within, the reason of the rule. Appellant cites to sustain its contention, *Merchants' Ins. Co. v. Herber*, 68 Minn. 420, 71 N. W. 624; *Young v. Swan*, 100 Iowa 323, 69 N. W. 566; *Crane Bros. Mfg. Co. v. Keck*, 35 Neb. 683, 53 N. W. 606. Respondent undertakes to distinguish these cases from the case at bar, and, while it is true that the facts are not exactly the same—as facts seldom are the same in any two cases—yet the principles announced in the cases cited undoubtedly sustain appellant's contention. In *Merchants' Ins. Co. v. Herber, supra,* it was decided that, where the specific money paid to the creditor, and applied on the debt of the principal, for which the surety is not bound, is the very money for the collection and payment of which he is surety, he is not bound by such application, and is equitably entitled to have the money applied to the payment of the debt for which he is liable.''

The obligation of a surety is to make good the default of the contractor in payment of valid claims for labor and material furnished upon the work. When it appears, as it does in this case, that a claimant for material has been, in fact, paid out of funds coming from the contract, the duty of the surety is discharged to the extent of that payment.

But the Shell company contends that, even though the surety company be relieved from liability, the port remains liable by reason of its unauthorized payment of the fifteen hundred dollars from the retained fund; this upon the principle that the retained percentage was a trust fund to be held by the port until all valid claims had been paid, and that, if the unauthorized payment had not been made, there would have been more than enough to satisfy the company's claim.

This contention overlooks some special features in the case. It is true that the retained percentage is a trust fund to be held for the benefit of claimants, and

that, if there is any surplus in the fund after the payment of all proved claims, the balance belongs to the contractor. And, of course, in this case the contractor would not be in position to question payment to the Shell company. But while we have held that, in so far as the liability of the surety is concerned, the rock supplied under the original contract and supplemental agreement is severable from the last six thousand odd tons, in so far as the port, the contractor and the labor and material claimants are concerned, all of the rock supplied should be treated as having been delivered under one contract. The port, not having taken a bond for the latter part of the work, with relation to claimants is in the position of a surety, with a surety's liabilities and equities.

The retained percentage for the whole job, even if the improper payment of fifteen hundred dollars had not been made, would not be sufficient to pay all of the proved claims. The Shell company filed its claim for $1,779.35 for material supplied on the whole job. This claim was made against the surety and the port. The port is liable for its failure to secure a bond covering the last portion of the job. As between itself and the Shell company, the port holds the position of surety and is entitled to have applied upon the port job the $585 of port money received by the contractor and paid to the company. In other words, the port should not be required to pay its debt twice.

The port contends that the trial court should not have allowed the claim of Chas. R. Watts & Company, because action thereon was not begun within four months from the time of filing the claim. The court found that there was due this claimant $548.49. Of this, $447.73 was on account of the latter part of the job, not covered by bond. As to this amount, the court

held the port liable for its failure to take a statutory bond.

Rem. Rev. Stat., § 10322 [P. C. § 9727-3], reads, in part, as follows:

". . . provided, however, that the limitation of four (4) months provided for herein shall not be construed as a limitation upon the right to sue the contractor or his surety where no right of foreclosure against said fund is sought."

Chas. R. Watts & Company is not claiming against the retained fund. Its claim is based upon the liability of the port in not having taken the statutory bond. The district, not having taken the bond, is liable to the same extent as the surety, had a bond been taken. And, of course, under this proviso, if a bond had been taken, the cross-complaint would have been timely.

The judgment is affirmed.

MILLARD, C. J., MAIN, TOLMAN, and BEALS, JJ., concur.