[No. 28919. Department One. May 8, 1943.]

GEORGE L. HALEY *et al., Respondents,* v. C. D. BRADY
*et al., Appellants.*[1]

[1]Reported in 137 P. (2d) 505.

*Catlett, Hartman, Jarvis & Williams,* for appellants.

*Wright & Wright (A. J. Laughon,* of counsel), for respondents.

MALLERY, J.—This action was brought by plaintiffs, as subcontractors, to recover compensation for their services in doing all the lathing and plastering on two ward buildings of the western state custodial school at Buckley. Defendants are the principal contractors and their surety. The bonds were furnished in accordance with Rem. Rev. Stat., §§ 1159-1161 [P. C. §§ 9724-9727], inclusive. The jury's verdict was for plaintiffs, in the amount of $4,366.22. There was a second cause of action upon which the verdict was for the defendants. This appeal by the defendants deals only with the first cause of action, upon a short written contract and five oral contracts for additional work. The reasonable value of the additional work, as itemized in the complaint, was as follows:

"(1) Suspended ceilings, material and labor ...........................$ 190.00
(2) Lathers' time preparing ground-work ........................... 95.06
(3) Padding out and building up crooked walls, etc. (material) .... 351.50
(4) Labor on last item.............. 439.30
(5) Extra labor cost in preparing ground work for plaster, and stand-by time........................ 2,234.78
(6) Increased cost because of change in plant location................... 992.00
(7) Labor cost, cleaning up.......... 100.00

Total.......................$4,402.64"

These items were not numbered in the complaint, but have been given the numbers (1) to (7) as above for the purposes of this opinion.

The evidence was conflicting with regard to the alleged oral contracts and the conditions surrounding the work performed by respondents. The facts which the jury was entitled to find were as follows: The respondents, who composed the partnership of Haley & Smyth, were asked by the appellants in October, 1939, to submit a bid for the lathing and plastering, according to plans and specifications, of the two buildings. The plans furnished them called for a simple plastering and lathing operation. They first submitted a bid of fourteen thousand dollars. Later on, upon the assurance that they were to have a certain fixed and definite place to set up their equipment from which they could carry on their operations, they were asked by the appellants to refigure the bid. They reduced the bid by nine hundred dollars and signed the agreement as follows:

"BRADY CONSTRUCTION COMPANY
General Contractors
1166 Mercer Street
Seattle, Washington
Oct. 23, 1939

"Haley & Smith
304 Bell St.,
Seattle, Washington
Re: Ward Building
Western State Custodial School
Buckley, Washington

"Gentlemen:
"This is your order to proceed with the furnishing of all labor and material to do plastering complete on Two Ward Buildings, Western State Custodial School, Buckley, Washington, Graham & Painter, Architects, all according to Plans and Specifications, including Stools, Metal Screeds and grounds and Cement Base. Also includes screeds for stairs if required, but does not include stair base or treads for the sum of—
THIRTEEN THOUSAND ONE HUNDRED AND NO/100 DOLLARS ($13,100.00).

The State Sales Tax and
all other State and Federal Taxes
are to be paid by the Subcontractor

Yours truly,

BRADY CONSTRUCTION CO.

By C. D. BRADY"

"ACCEPTED:

HALEY & SMITH

By R. C. SMYTH"

Upon reporting for work, respondents discovered that the promised place for their plant location was otherwise occupied by tile setters and brick masons, whose operations had to precede those of respondents. Respondents refused to proceed until the place for their plant location was rendered available, or they were compensated for their increased costs that would be occasioned from operating from some other location.

This was the situation on May 6, 1940, when a definite oral agreement was made and entered into by R. C. Smyth of the respondents, and C. T. Brady of the appellants, in reference to the payment of their increased costs occasioned because of the change in the plant location (item 6 above). The exact amount which respondents were to receive was not stated in so many words, but how it could be arrived at was a matter of fairly simple mathematical computation.

When respondents started their actual lathing operations in the basement portion of the boys' ward building, it was discovered by them that, in that particular area at least (that being the only section in either building that was then ready for lathing and plastering operations), they were being asked to carry on an operation that was not in accordance with the plans and specifications. Accordingly on that date, May 13th, Mr. Smyth of respondents entered into an oral agreement with C. T. Brady of the contractors, in reference to their reimbursement for their increased costs upon

that particular section of the work and for the remedy of certain defects that would have to be corrected in the window stools in and about the building. This was item 2 as set forth above.

Two days later, on May 15, 1940, an oral agreement was entered into between these same individuals with reference to general cleaning up, which respondents were to do on the two buildings upon the completion of their operation. The amount agreed upon was one hundred dollars (item 7 above).

From May 6, 1940, until and including May 22, 1940, R. C. Smyth repeatedly told C. T. Brady that the contractors' operations were not then at such an advanced stage that the lathing and plastering operation could be carried on in an orderly and economical manner. He urged that the lathing and plastering operation be deferred until the contractors' other operations had gotten out of the way. He was assured, however, that the contractors were putting on a larger crew of men and that their operations would, within a few days, be entirely out of respondents' way. Accordingly, respondents brought their plastering crew to the job on Monday, May 20, 1940. In two days time, all of the plastering had been done by the crew in the area then available in the basement. By that time it became apparent to Mr. Smyth that respondents' lathing and plastering operations could not proceed under the conditions existing, except at a prohibitive cost to them, and that respondents were then being called upon to do a lathing and plastering job not "all according to plan and specifications" because of the poor, faulty, or incomplete work of the appellants.

On May 22, Mr. Smyth made a rather extensive examination in and about the boys' ward building. He immediately sought out C. T. Brady and insisted that he go through the building with him. He told him that

respondents would not proceed any further under the conditions existing because of the prohibitive increased costs, that respondents were withdrawing their entire crew from the operations that night, and would remain away from the work until the contractors had the work in a reasonable condition so that respondents could proceed without interruption. Mr. Brady and Mr. Smyth finally arrived at an agreement pertaining to the matter of additional compensation to be paid respondents for their operation under the conditions and for overcoming and correcting the defects in the contractors' work that had preceded them, and the manner in which the amount of respondents' additional compensation would be computed. This oral agreement had to do with items 3, 4, and 5 above.

The situation and the working conditions are testified to by at least two other witnesses, but the evidence of this oral contract which related to nearly three-fourths of the additional items in controversy, was testified to only by Mr. Smyth, himself, as follows:

"I looked at the building . . . I saw the west wall—the inside of the outer west wall was in a very, very crooked condition, . . . I thought if this is the improvement I had better look around the building, and I did, and if anything it was worse on the first floor, the condition of the walls was worse than in the basement, and I went through other rooms and found the condition of the ceilings with portions of some of the lumber in the corners and large chunks of concrete were hanging down in some places, and reinforcing iron about 5/8th thick sticking down two or three inches that would have to be sawed off with a hack saw or burned off, and nails and heavy fins of concrete sticking down in the ceiling and they would have to be taken off, . . . I went down to Ted's office, and he said, 'What is the matter?' and I said, 'I want you to come through the building,' and he said, 'I thought everything was settled; what is the matter?' and I said, 'Everything is not settled quite, and I

want you to come in this room here and look at it. And this is the dining room, on this wall here,' I said, 'Look at the shape of that,' and he said, 'Smyth, that does look pretty bad,' and I said, 'How does that happen, Ted?' and he said, 'I can show you where the line is, and I gave it to the bricklayers, but they evidently didn't follow it, it is too late now, we can't tear that wall down,' and I said, 'What are you going to do with it?' and I said, 'It will take two or three inches of mortar to beam the walls up to the plans and specifications. Can't you build the walls right in the first place, rather than do that?' And I said, 'Let us go over the building.' And we discovered practically the same thing in other places. . . . The corridor partitions were not bad, but these cross-partitions through here were crooked and hanging over, and in a very bad condition. . . . I showed him the ceilings, . . . and we followed around the building and I said, 'Ted, you have promised me for two straight weeks what you were going to do and you are going to do this, and this, and get ahead with the tile setters, and we still have no tile setters in the basement, and we can't finish up, and I will take my crew off tonight and not come back until I know there is going to be work good and ready for us to do.' He said, 'You can't do that.' And I said, 'I will show you whether I can, Ted, I won't put up with you any more.' And he said, 'I agreed to pay for your costs,' and I said, 'I can't have a crew of men here; I have the best crew of men I ever had and I can't disorganize them and have them working at a disadvantage for anybody.' . . . He said, 'There is only one way to do, we will have to go ahead and do the best we can. What do you think the cost will be to do this extra work?' and I said, 'I don't know, Ted, I have no idea what it will be. I do know this, we made a liberal estimate for material and labor and we considered in that estimate we had a safe profit of 10% for ourselves. The only way—I don't know any other way of keeping an account of this, except for me to keep my time book, and whatever more the cost would be to do this work more than the amount that it ought to cost and that

would be the amount you would have to pay me.' He said, 'Well, maybe that is the only way out of it. You do it that way.' . . . I told Ted Brady that I wanted this to be our last session, and we didn't want any more of this controversy; that I was tired and sick. . . . I said, 'Ted, we are moving from room to room and not getting anything finished, and up and down in the basement and on the first floor and the second floor and leaving portions all over the building to be done later. Do you realize what that will run into in money?' I said, 'I want you to understand what this is going to cost you,' and he said, 'I know, it will cost more. How much do you think it is?' And I said, 'Ted, I can't tell you. No one can tell. There is only one practical way, to take my estimate sheet, which I believe is liberal, and then the timebooks, and whatever more costs from the timebook than our estimate sheet, that is what would be the amount we should receive.' And he said, 'Will you let our bookkeeper look over your timebook?' And I said, 'Yes. I will do more than that. I will furnish you weekly lists. . . .' I said, 'Ted, you understand we are not going to have any more controversy, this carries with everything that we agreed to do,' and he said, 'Yes, go ahead and do everything that is needed to be done. Don't bother me.' He said, 'I am busy the same as you are. When you run up against something go ahead and do it, and if I can help you call on me and I will do what I can.' "

Defendant C. T. Brady denied most of this transaction and the supporting facts. Particularly did he deny that he had made any such oral contract, or contracts, with Smyth. Generally he claimed that, with certain rather inconsequential exceptions, the buildings were in shape for plaintiffs to do their work and that there was no reason why they should be paid anything in addition to the amount originally agreed to in writing. In fact, defendants claimed a small offset for alleged defects in plaintiffs' work.

The remaining item No. 1 was not disputed by de-

fendants except as to the agreed amount, defendants contending that they agreed to pay $129.20 instead of one hundred ninety dollars or one dollar and ninety cents per yard. Mr. Smyth's story of this transaction was given by him as follows:

"On June 10th there was a matter about some extra lathing. Our lathing foreman called my attention to the fact that there were no hangers in the ceilings and portion of the building. I went to Mr. Brady and asked him about it. He said it was an oversight, 'Have your lathers drill for them and put the hangers in yourself. If there is anything of that kind you find, Smyth—I thought we had several talks sometime ago, that you were to go ahead with any little matter and not bother me about it.' And I said, 'I wouldn't bother you about this except I didn't know you had decided not to put a suspended ceiling in here, and maybe you want to plaster on the slab. I couldn't tell without consulting you.' There was work done after that on the window stools and I didn't bother him with it, he told me not to."

It is first argued that the action was equitable in nature and that the trial court erred in denying the defendants' motion to strike the demand for a jury. The surety was sued under the provisions of Rem. Rev. Stat., §§ 1159-1161. At no time did plaintiff make any attempt in this action to assert any lien against the reserve fund required to be set upon public improvements by the provisions of Rem. Rev. Stat., §§ 10320 and 10322 [P. C. §§ 9727-1 and 9727-3].

It is contended that Rem. Rev. Stat., §§ 1159-1161, are lien statutes. We cannot agree. We think that the legislature did not intend any merger of these different statutes or the remedies provided for in them, for § 10322 contains and ends with the following proviso:

"Provided, however, that the limitation of four (4) months provided for herein shall not be construed as a limitation upon the right to sue the contractor or his

surety where no right of foreclosure against said fund is sought."

See, also, *Maryland Cas. Co. v. Tacoma*, 199 Wash. 384, 92 P. (2d) 203; *United Pac. Cas. Ins. Co. v. Port of Everett*, 182 Wash. 285, 295, 46 P. (2d) 736.

In the case of *Gatudy v. Acme Const. Co.*, 196 Wash. 562, 569, 83 P. (2d) 889, this court said:

"The right to a trial by jury is carefully protected by our constitution and laws and must be guarded by the courts. While a trial court has a large discretion in determining the essential nature of an action, and appellate courts will uphold the exercise of that discretion when it is possible to do so, before the demand of a party for a jury trial, in an action basically legal in its nature, can be denied, it must appear that the cause presents some feature essentially equitable in its nature. The mere fact that the evidence may present complicated questions of fact, or even questions involving figures difficult to carry in the mind, is not a sufficient reason for the denial of a trial by jury."

We are satisfied that a suit of this sort, brought under the provisions of Rem. Rev. Stat., §§ 1159 and 1161, is an action at law and that the trial court correctly treated this case as one in which the plaintiff was entitled to a trial by jury.

It is urged, secondly, that neither the original bill of particulars furnished by respondents nor the "amplification of, or further bill of particulars" furnished later, were sufficient, and that consequently the court should have stricken all of the evidence relating to the extra or additional labor and material furnished in accordance with the terms of the alleged oral contract.

The bills of particulars furnished seem to us quite ample to prevent surprise on the trial, and fully sufficient to enable the appellants to prepare their defense.

The trial court did not err in refusing to strike the testimony.

Appellants' next contention is that the court erred in giving instruction No. 13, which is not set out in their opening brief and hence will not be considered by us.

The appellant C. T. Brady admitted upon cross-examination that he had been sentenced by the United States district court to pay a fine of five hundred dollars. The exact nature of the crime for which the fine was imposed was not brought out. Error is assigned (1) in sustaining an objection to the testimony of the witness himself as to the circumstances under which he had entered the plea of *nolo contendere,* (2) in refusing to permit the attorney who had represented C. T. Brady in the criminal case to testify as to the circumstances surrounding the entry of this plea of *nolo contendere,* and (3) in refusing to give a proposed instruction of defendants concerning the meaning and effect of the plea of *nolo contendere* and a conviction thereon.

Following is the colloquy between the court and appellants' counsel:

"THE COURT: You may ask him what crime he was convicted of. The circumstances are admitted, it is admitted only for a narrow purpose, which I shall explain to the jury later. Guilt or innocence is immaterial. It is a conviction or the lack of it that is material. MR. SIMON: I am not talking about a conviction. I am talking about a plea and what he understood the effect of that plea was, and why he entered it. THE COURT: It would be immaterial. The objection is sustained."

The question of the admissibility of evidence of prior conviction upon such a plea was decided in the case of *State v. Radoff,* 140 Wash. 202, 248 Pac. 405, wherein the court said:

"Nor was there any error in admitting evidence of a prior conviction of the appellant as impeachment of him. It is argued in this connection that the former conviction, having taken place under a plea of *nolo contendere,* was inadmissible; but we find that the authorities generally hold that testimony of a conviction based upon that plea is subsequently properly admissible as against a person so convicted as affecting his credibility, although a conviction upon that plea has not in all respects the same effect as a conviction after trial or on a plea of guilty. *State v. Herlihy,* 102 Me. 310, 66 Atl. 643; *State v. Conway,* 20 R. I. 270, 38 Atl. 656; *State v. Burnett,* 174 N. C. 796, 93 S. E. 473, L. R. A. 1918A, 955; *State v. Henson,* 66 N. J. L. 601, 50 Atl. 468, 616; *Tucker v. United States,* 116 C. C. A. 62, 196 Fed. 260, 41 L. R. A. (N.S.) 70."

The circumstances surrounding the entry of the plea *nolo contendere* would tend, it might be presumed, to show that the defendant was not guilty, or, at most, only technically guilty. In the case of *State v. Evans,* 145 Wash. 4, 14, 258 Pac. 845, it was said:

"The proof of a prior conviction is not, under the statute, evidence of the guilt of the accused of the offense for which he is on trial. Under no rule could it be received for that purpose. It is evidence affecting his credibility as a witness only, and can be shown against a defendant only when he offers himself as a witness. The question, therefore, whether the accused is guilty of the crime for which he was formerly convicted is not material, and presents a collateral issue which the court will not inquire into. As is said by Mr. Wharton, in his work on criminal evidence (10 ed., 3596a):

" 'A conviction of crime, when offered to disqualify a witness, cannot be impeached by him by proof of his innocence, since it is the law that it is the conviction that disqualifies. The same rule obtains as to convictions when admitted under statutes which permit convictions of infamous crimes to be introduced in order to discredit a witness.' "

The trial court committed no error in refusing to permit the witness, and his attorney in the criminal case, to explain the circumstances surrounding the entry of the plea.

■ It is finally urged that the court erred in refusing to charge the jury that the evidence of an oral modification of a written contract must be clear and convincing. Defendants proposed the following instruction:

"Where the parties have entered into a written agreement, a party who seeks to show that the agreement was subsequently orally modified cannot recover unless the evidence is clear and convincing that the parties subsequently and mutually agreed to such an oral modification of a written contract. A written contract is a solemn instrument and is not to be modified by a mere preponderance of the evidence. Generally the burden upon a party in a civil suit is merely to establish his claim by a fair preponderance of the evidence but where, as in this case, a plaintiff seeks to show that a written contract was modified by a subsequent oral agreement, the burden upon such a plaintiff is not satisfied by a mere preponderance of the evidence but must be established by evidence that is clear and convincing."

The trial court refused to give this instruction and instead gave instruction No. 3, reading as follows:

"You are instructed that when the plaintiffs and the defendant Brady Construction Company entered into the two written contracts of October 23, 1939, and January 29, 1940, they did not by the acts of entering into said contracts in writing, disable themselves from entering into further contracts thereafter in reference to the operations described in this contract.

"Notwithstanding these two contracts were in writing, yet you are instructed that the parties thereto were under the law at full liberty to subsequently modify, alter or add to said written agreements, or either of them, either orally or in writing, in reference

to any matter or thing upon which the parties might mutually agree. If you find, from a *fair preponderance* of the evidence in this case, that said two written con-tracts, or either of them, were modified by mutual oral agreement between the parties, and that the plaintiffs performed additional work and furnished additional material in pursuance thereto, then the plaintiffs are entitled to recover for the reasonable value of said additional labor and materials furnished." (Italics ours.)

Appellants admit that the question as to which instruction is correct was decided in the case of *Clements v. Cook,* 112 Wash. 217, 191 Pac. 874. They criticize the case and particularly some of the supporting language found in it. They ask that we overrule that case.

The right to modify a written contract by a subsequent oral one is unquestioned. *Kelly Springfield Tire Co. v. Faulkner,* 191 Wash. 549, 71 P. (2d) 382; *Ritchie v. State,* 39 Wash. 95, 81 Pac. 79; 20 Am. Jur. § 1163, p. 1016.

The modification herein, if it may be termed a modification, is not of the character of which proof was ever required to be shown by more than a fair preponderance of the evidence. This is a case in which it was claimed by respondents that the oral contracts for extra labor and material were made necessary by reason of the failure of the appellants to perform their part of the contract. As stated in 17 C. J. S. § 371, at page 845:

"Where the necessity for extra work results from the acts, errors and mistakes of the architect or engineer of the owner, under whose supervision the work is to be done, the loss should fall on the owner, and the builder may recover additional compensation, and this rule applies if the extra work is outside the original contract, although it provides that the contractor will not charge for extra labor. Additional compensation may be recovered for extra work which becomes neces-

sary because the building cannot be constructed according to the plans and specifications furnished, as required by the contract, such as for alterations rendered necessary by defective plans; or for additional work or expense which is rendered necessary by the owner's negligence, or failure to perform his part of the contract."

The following quotation from the case of *M. L. Ryder Bldg. Co. v. Albany,* 176 N. Y. Supp. 457, 458, is applicable to the instant case:

"(1)   In every express contract for the erection of a building or for the performance of other constructive work, there is an implied term that the owner, or other person for whom the work is contracted to be done, will not obstruct, hinder, or delay the contractor, but, on the contrary, will in all ways facilitate the performance of the work to be done by him.   This is the principle which underlies the cases of *Messenger v. City of Buffalo,* 21 N. Y. 196; *Mansfield v. N. Y. Central R. R. Co.,* 102 N. Y. 205, 6 N. E. 386; *Mulholland v. Mayor,* 113 N. Y. 631, 20 N. E. 856; *Horgan v. Mayor,* 160 N. Y. 516, 55 N. E. 204; *Gearty v. Mayor,* 171 N. Y. 61, 63 N. E. 804; *Del Genovese v. Third Ave. R. R. Co.,* 13 App. Div. 412, 43 N. Y. Supp. 8."

In the *Mansfield* case the court said that the contract implied:

"   .   .   .   an understanding by all parties that they were to be unrestricted in the employment of means to perform it, and that nothing which it was the duty of the owner to do to enable the contractor to perform, should be left undone."

The judgment will be affirmed.

SIMPSON, C. J., JEFFERS, MILLARD, and STEINERT, JJ., concur.

---

June 28, 1943.  Petition for rehearing denied.