R. J. STUDER, d/b/a Studer Construction Company, and Studer Construction Company, a foreign corporation, Appellants (Defendants below),

v.

Willard N. RASMUSSEN and Clifford E. Rasmussen, d/b/a Rasmussen Brothers, a Co-partnership, Appellees (Plaintiffs below).

No. 2853.

Supreme Court of Wyoming.

Oct. 20, 1959.

344 Pac. 2d. 990

466

Henry A. Burgess and Bruce P. Badley, Sheridan, for appellants.

468

Holstedt & Schwartz, Sheridan, oral argument by Robert E. Holstedt and Harry F. Schwartz, Sheridan, for appellees.

Before BLUME, C. J., PARKER, J., and PEARSON, D. J.

## OPINION

Mr. Chief Justice BLUME delivered the opinion of the court.

This is an action brought by Willard N. Rasmussen and Clifford E. Rasmussen against R. J. Studer, doing business as Studer Construction Company, to recover an amount due on a subcontract and for damages for delay in connection therewith. Subsequently the Studer Construction Company was added as a defendant.

The defendants had a contract with the United States Government for constructing water and sewer systems, paved roads and electrical distributing system

at the Glasgow Air Force Base near Glasgow, Valley County, Montana. Part of this work relating to the construction of roads was subcontracted by the defendants to the plaintiffs in this case. Under that contract the subcontractors agreed to furnish all labor, materials, equipment and supplies, and to perform all work as described below. It was agreed that the work, labor and materials to be done, performed or furnished by the subcontractors were as follows:

"Item No. 7. 3,760 Cu. Yd. Leveling Course, 1½ inch minus (in place)

"Item No. 8. 30,300 Cu. Yd. Base Course, 1½ inch minus (in place)

"Item No. 10 (Part). 1,670 Ton Mineral Aggregate, (produce and stockpile only.)"

The contractor agreed to pay the subcontractors for performance of the subcontract as follows:

|  |  |  |  | "Unit Price | Estimated Amount |
|---|---|---|---|---|---|
| "Item No. | 7. | 3,760 | C.Y. | $ 1.40 | $ 5,264.00 |
| "Item No. | 8. | 30,300 | C.Y. | 1.00 | 30,300.00 |
| "Item No. | 10. | 1,670 | Ton | 2.00 | 3,340.00" |

It might be mentioned that many months after the times hereinafter stated Item No. 10 was eliminated from the work to be performed on behalf of the Government of the United States but the government agreed to pay and did pay the defendants for 387 tons of mineral aggregate under Item 10 already produced at that time and the defendants herein used 194 tons and 91 tons of this aggregate and agreed to pay the plaintiffs for that at the rate of $3 per ton.

The contract provided that the subcontractors should be bound by the general conditions of the contract between the government and the contractor.

This action was brought on May 15, 1957, in the District Court of Sheridan County. In the first cause of action the plaintiffs claimed judgment for $2,818.04 and interest. This included the sum of $1,000 still due under items 7 and 8, the amount paid by the government for the 387 tons of mineral aggregate, the amount due for the mineral aggregate used by the defendants themselves and also the sum of $389.04 for a bond furnished by the plaintiffs in accordance with the agreement between the parties.

In the second cause of action plaintiffs claimed damages for delaying the plaintiffs in the performance of their contract for a period from July 15, 1955, to September 15, 1955, and also further damages by reason of the fact that they had to perform the contract in cold weather and were delayed in the work by reason thereof.

The court rendered judgment for the plaintiffs on the first cause of action as claimed by the plaintiffs and on the second cause of action found the following facts:

"8. That on July 5, 1955, the Defendant wrote Plaintiffs a letter directing them to move on to the job and commence work thereon by July 11, 1955 at the latest.

"9. That in response to said direction from the Defendant, the Plaintiffs moved their equipment, supplies and labormen from Sheridan, Wyoming, to the jobsite at Glasgow Air Force Base, near the town of Glasgow in northern Montana, and

were ready, able and willing to begin performance under said sub-contract between the parties hereto on the 20th day of July, 1955.

"10.    That the approximate value of Plaintiffs' equipment allocated, moved to and used upon said job was $200,000.00.

"11. That on the said 20th day of July, 1955, and for a period thereafter, extending up until September 12, 1955, the Plaintiffs though ready, willing and prepared to do so, were unable to commence performance of the work to be done by them under said contract between the parties hereto because Defendant had failed to perform preliminary work required of him under his prime contract with the government for the installation of water and sewer utility lines which had to be placed under the streets and roads before the Plaintiffs could commence performance under their sub-contract to place the gravel thereon, a circumstance of which the Defendant was advised and knew.

"12. That by reason of the Defendant's action in directing the Plaintiffs to move in upon said job, before the same was in a condition for them to perform under their sub-contract, and by reason of the Defendant's failure to perform the preliminary work on its part to be done under the prime contract with the government before the Plaintiffs could commence performance, until September 12, 1955, the Plaintiffs were required to, and did, expend in wages for its labormen at the Glasgow Air Force Base, the amount of Three Thousand One Hundred Eighty-Four Dollars and Forty-Two Cents ($3,184.42) during said delay period, commencing July 20, 1955, and ending September 12, 1955, for which Plaintiffs received no benefit; and, for the same reasons and for the same period, were required to hold in readiness upon said job their machinery and equipment necessary to perform the work to be done by them

under said sub-contract for which they received no benefit, and for which the reasonable rental value, or return thereon, during said delay period amounted to Twelve Thousand Fifty Seven Dollars and Six Cents ($12,057.06).

"13. That the evidence fails to show that the additional delay of approximately one and one-half months alleged by the Plaintiffs in the completion of the work done under said contract, after the same had been commenced, was entirely due to the Defendant's action in delaying the commencement of the work to be done under the Plaintiffs' sub-contract until September 12, 1955."

Judgment for the plaintiffs accordingly was entered upon the first cause of action in the sum of $2,818.24 and judgment for $15,241.48 on the second cause of action. The court disallowed any damages by reason of the delay claimed by the plaintiffs due to cold weather conditions.

From this judgment the defendants have appealed to this court.

The letter mentioned by the court written by **R. J.** Studer to the Rasmussens is as follows:

"Billings, 7-5-55

"Whitey Rasmussen,

"Rasmussen Brothers:

"Thanks for returning the signed contract. I am enclosing your copy for your files.

"You can get going up there as soon as you wish to, but don't figure on later than this week if possible. Arnold is adding to his dirt equipment, and is going good on the streets. The contractor on

the dormitories and on the fire station, mess hall etc. has signified his acceptance of our sub prices, so that will call for some more gravel and possibly aggregate at better prices. It looks certain that you can put out concrete aggregate if you will at pretty good prices. Herb has been approached by several contractors including NWEng., about whether we would put out material for them. He has a record of whats been let and who has it. The pit looks OK for sand too as far as I can gather. No concrete tests as yet, but the stuff is non-pl. and plenty hard.

"Hope that you can make plans to move up by the end of this week, or by the 11th of July at the latest.

"Studer Construction Co.

"by /s/ R. J. Studer

"R. J. Studer"

The writing of this letter and the receipt thereof by the Rasmussens is not disputed herein.

The work to be done by the plaintiffs and appellees, as explained by the evidence herein, was to do some stripping of the top soil, brush and timber of the gravel strata in preparation for removal of gravel for processing, to produce gravel and place it on the roads and streets in accordance with the contract requirements and also to level the streets. In order for the plaintiffs to do this, it was necessary for the defendants to complete the utility work under the contract with the Government of the United States consisting of sewer lines and water lines. The Glasgow Air Force Base was laid out in blocks, with streets laid out at the sides. The water and sewer lines were not to be placed under but along the sides of the streets. But these lines cros-

sed the streets at various places, and until the lines were so laid across, there were only short segments between the crossings which were too short for the operation of the machinery used by plaintiffs in placing the gravel on the streets and leveling them. In accordance with the letter above set out, plaintiffs, appellees, arrived at the Air Force base on July 13, 1955, but found that the water and sewer lines had not been laid by the defendants as required so as to enable them to place any gravel on the lines laid out for roads and streets. They did some stripping commencing about July 21 and July 28, 1955, but according to the testimony of Willard N. Rasmussen, this work was of no benefit in connection with the performance of the contract in that stripping should be done at the same time when the gravel is produced, but he employed some of his laborers in stripping so as to keep them away from the saloons.

There is some testimony in the case with reference to some gravel production being done in the month of August 1955, and the testimony of Willard Rasmussen and Mr. Skidmore, the resident engineer in charge, is not quite in harmony. The court evidently found that this work was of no value and that as a matter of fact the actual production of gravel for putting on roads and streets was begun on September 12, 1955.

According to the witness Skidmore the defendants did not speed up their work as they should have under the contract which they had with the United States Government, and we think we must accept the finding of the court that the plaintiffs and appellees herein were delayed in their work from July 20 to September 12, 1955.

Counsel for appellants state that they make "no objections to the findings of the trial court so far as the amounts due and owing under the first cause of action are concerned." And we accordingly proceed to consider the questions raised by appellants in connection with the second cause of action, namely, the damages claimed by reason of the delay above mentioned.

1. The contract with the United States Government provided that "Samples shall be submitted to the Contracting Officer not less than 30 days before the start of placement operations." Counsel for appellants claim that by reason of this fact the trial court erred in awarding damages during the period that the Rasmussens were barred from placing material upon the job; that "the time delay was a condition precedent to the further performance by them of the contract." If the contention of appellants is correct, the amount of damages awarded is excessive. The point is a troublesome one. Counsel for appellees contend that considering the facts herein and the various provisions of the prime contract the understanding of all the parties was that the submission of samples was not necessary and that whatever samples were submitted were for the convenience of the Rasmussens. The provision above mentioned could be waived and we think that the evidence herein sufficiently shows that it was waived. There is no evidence in the record that the agents of the government made any demand for samples after the Rasmussens arrived at the base or that they raised any objections in connection therewith. There is no testimony in the record that the government prevented the Rasmussens from putting gravel on the roads on September 12, 1955, because samples had not been submitted as provided in the prime contract. That would have been the time for making ob-

jections if any were to be raised under the foregoing provision as to samples. The government accepted 387 tons of mineral aggregate but there is no evidence that samples thereof had been submitted under the above-mentioned requirement, thus indicating that the provision had been waived. The reason for the waiver is explained partially at least by the fact that the gravel was to be taken from pits controlled by the government so that samples doubtless had already been approved by government engineers. Willard Rasmussen testified as follows:

"Q. You were questioned on the sampling of your gravel and your product at this base. Where was the material actually accepted for the job? A. Final acceptance was in place on the road.

"Q. There was no question of acceptance in the the gravel pit? . . . acceptance on the road, is that right? A. Acceptance on the road was the only provision.

"Q. And the acceptance could not be had until it was placed on the road? A. Not final acceptance. They had to accept areas or pits, and so on and so forth. By that I mean had we used gravel from another source it would have to be approved all on up the line to all in all, and so forth. This area that was designated as the borrow area for our particular part of the job had been approved for the project. And the testing that was done when we took samples and brought them to their laboratory was done for our convenience so that we could know what it took on our part to meet their specification. And they approved our samples as we brought them in.

\* \* \* \* \* \*

"Q. You have been asked on page TP 3-2 about the 30 days sampling period before starting of

placement operations. When you appeared on the Base were you told what areas had already been accepted for gravel? A. Yes, sir.

\*        \*        \*        \*        \*        \*

"Q. When you arrived on the job had an area in which you were to get the gravel already been approved? A. Yes, sir."

R. J. Studer went on the witness stand and did not claim that he placed any reliance on the foregoing provision as to samples so as to excuse him from sooner performing the work he was to do, and he evidently put the same construction on the contract as the Rasmussens. He said nothing in his letter of July 5, 1955, as to the submission of samples. We are inclined to believe that we should not be justified in reversing the judgment herein on the ground of the contention made as above mentioned.

2. Appellants contend that in order that the appellees herein might recover damages for delay they must show (1) that there was contractual requirement that the Rasmussens were to be given the work site by a time certain and (2) that there was a delay and a default as well and that the appellees were damaged by the default. They quote from the case of United States v. Howard P. Foley Co., Inc., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44, and United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L. Ed. 53. In the latter case, Rice contracted to install plumbing, heating and electrical equipment while another contractor constructed the building. A change was necessary to be made as to the ground on which the building was to be constructed by reason of the soil originally selected proving to be inadequate for the erection of a building thereon. By reason of the change, the building was not ready for

Rice for some months. The court held that the date for the completion of the building was tentative, of which Rice had to take notice, and that under the circumstances the government was held to be not liable for the delay. The case at bar is distinguishable in two points. There was no tentative date. The letter of July 5, 1955, set a definite date when the Rasmussens were to commence the work. Second, no question of change in the original contract is involved herein. In the first of these cases syllabus 1, 329 U.S. 64, is as follows:

> "Under the government construction contract here involved, for installation of lighting of the runways of an airport, the Government was not liable for damages for delay in making the runways available to the contractor, though the delay prevented completion within the specified time, since the contract did not obligate the Government expressly or impliedly to make the runways available promptly, it contained provisions anticipating delays caused by the Government and providing remedies other than an award of damages to the contractor, and no fault actually was chargeable to the Government 329 U.S. at pages 66-67, 67 S.Ct. at pages 154-155."

The court followed the rule laid down in the Rice case and the decisive statement of the case seems to be the following at 329 U.S. 68, 67 S.Ct. 156,

> "* * * But in this case there is ample indication both in the extrinsic facts and in the contract terms that changes and delays were anticipated and remedies therefor provided. * *"

We think that this case too cannot be said to be in point in the case at bar. That also can be said as to the case of H. E. Crook Co., Inc., v. United States, 270 U.S. 4, 46 S.Ct. 184, 70 L.Ed. 438.

The rule of law applicable in this case appears to be that the appellants herein were required, before calling the Rasmussens to the base, to perform the preliminary work which was necessary to be done by them in order that the Rasmussens might go to work and perform their work under the subcontract. Thus the court said in Edward E. Gillen Co. v. John H. Parker Co., 170 Wis. 264, 171 N.W. 61, 67, 174 N.W. 546,:

"The general rule therefore applies that where labor and material are to be furnished and rendered by the one party and to be paid for by the other, and the one furnishing the work, labor or material is dependent to some extent upon the other party performing his part, or providing for the prompt performance by others of a portion of the work, there arises by implication an obligation on such person, situated as is the defendant here, not only to refrain from doing that which will interfere or impede the contractor in the performance of his part, but that it will also do all that which is reasonably necessary in order to enable the contracting party to so perform. For a failure in either respect damages can properly be awarded to the person so delayed or impeded. * * *"

In the case of Stehlin-Miller-Henes Co. v. City of Bridgeport, 97 Conn. 657, 117 A. 811, 813, the court stated:

"The plaintiff claimed that this implied contract was that the defendant must provide a building in a proper state of forwardness so that the plaintiff's work could be installed within the time limited in its contracts with defendant. The defendant disputed this claim and insisted upon the argument in this court that there was no authority to be found supporting it. The trial court in sustaining the demurrer erroneously held the rule to be contrary to plaintiff's position. The rule is

undoubted in circumstances such as were present in this case that an implied contract arose on the part of the defendant to keep the work on the building, whether done by itself or other contractors, in such a state of forwardness as would enable the plaintiff to complete its contracts within the time limited. * * *"

A number of cases are cited. 5 Williston on Contracts, 1937, § 1293A, pp. 3686, 3687, considers this as an elementary principle and states as follows:

"* * * 'Where a party stipulates that another shall do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing that thing.' [Gay & Co. v. Blanchard, 32 La.Ann. 497] Often indeed, the situation is such that the cooperation of one party is an essential prerequisite to performance by the other, in which case there is not only a condition implied in fact qualifying the promise of the latter, but, as already stated, an implied promise by the former to give the necessary cooperation. * * *"

See also Haley v. Brady, 17 Wash.2d 775, 137 P.2d 505, 146 A.L.R. 859; Indianapolis Northern Traction Co. v. Brennan, 174 Ind. 1, 87 N.E. 215, 90 N.E. 65, 68, 91 N.E. 503, 30 L.R.A.,N.S., 85. An annotation on the subject is contained in 115 A.L.R. 65 and subsequent pages and numerous cases are cited to sustain the rule above mentioned. Another annotation on the same subject is contained in 91 L.Ed. 48-80 and, on page 57 of this annotation, it is said:

"Where a contractee fails to have the premises in a state of readiness, so that the contractor can proceed with the work within the time contemplated by the contract, and the contractor is damaged thereby, the contractee is liable for the damages caused by such delay."

As above stated, counsel for appellants further contend that delay itself gives no ground for damages, but in order that damages may be awarded there must in addition thereto exist a default. They further contend that the appellants were not in default. That contention seems to be based on the theory that in order to be in default it was necessary in this case for the government to so declare and that since the delay of the appellants was excused by the government there was no default on the part of appellants and that hence no basis for damages herein exists on account of the delay. We think that counsel are in error. The fact that the government excused appellants' delay would under no principle of law excuse the appellants from performing their duty to the appellees. We may concede that if the appellants had been hindered in their work by the government or by circumstances beyond their control, then no damages should have been awarded. But that is not the situation here. The testimony shows that appellants commenced laying pipe for sewer and water about the middle of June 1955—Mr. Skidmore said June 24, 1955. Appellants knew or should have known that when they wrote the letter of July 5, 1955, to the Rasmussens that the appellees could not do any effective work for some time thereafter. As early as July 6, 1955, Mr. Skidmore requested the appellants to "step up the progress". We think the trial court was justified in finding that the appellants were negligent insosar as the appellees were concerned and that they should respond in damages on account thereof.

3. Counsel for appellants contend that if there was any default on appellants' part appellees waived their rights to recover any damages by continuing with the work. Counsel cite the case of Snowball v. Maney

Bros. & Co., 39 Wyo. 84, 270 P. 167, 271 P. 875, 61 A.L.R. 199. That case, though containing expressions that might be construed as sustaining the contention of appellants, is not in fact in point. In that case Snowball undertook to construct a road along a certain line. The line of the road was changed and Snowball constructed the road along that line. He then brought an action claiming that he was entitled to the profits which he would have made if the road had been constructed along the old line. It was held that he could not recover on that theory. It appears in that case that there was a delay caused by reason of the change of the road and Snowball was paid approximately $1,000 by reason of that delay. So, if anything, the case would seem to be contrary to the contention of the appellants herein. Counsel for appellants also cite us to 25 C.J.S. Damages § 43, p. 521, where it is stated: "Profits cannot be recovered as a distinct element where plaintiff sues upon a completed contract and recovers the contract price." The authority cites Wyant v. United States, 46 Ct.Cl. 205, and Ryan v. Rodgers & Hagerty, Inc., 197 App.Div. 662, 189 N.Y.S. 269. These cases are not in point. The authority also cites Southern Bitulithic Co. v. Hughston, 177 Ala. 559, 58 So. 450, from which counsel for the appellants quote in their brief. The case holds that when the plaintiff resumed work he waived the breach so far as profits were concerned. The contract having been performed became the measure of profits to be earned thereunder. However, the court seems to have made a distinction between profits to be earned under the contract and damages sustained by reason of some default on the part of the owners. The court said at 58 So. 453:

"* * * Whatever may have been the proper rule under the circumstances for the admeasurement of damages in the way of actual losses—a question

we do not find presented by the record and assignments of error—it seems clear that plaintiff could not recover profits he might have earned. * * *"

The case cites 3 Sutherland, Damages, 3d Ed., § 714. As we shall note later, that author is not any authority for the proposition that when a subcontractor continues to work he thereby waives any damages which he may have sustained by reason of the owner's default.

If there is an express contract in connection with the damages, that contract, of course, must govern. That was held true, for instance, in the case of Geiger v. Western Maryland Railroad Co., 41 Md. 4. Nor is the statement as to the damages to be recovered entirely uniform in all of the cases on the subject. See, for instance, Louisville & N. R. Co. v. Hollerbach, 105 Ind. 137, 5 N.E. 28, and Mansfield v. New York Cent. & H. R. R. Co., 102 N.Y. 205, 6 N.E. 386. In 9 C.J. 791 it is said:

"* * * In case of a delay caused by the owner, the builder is not obliged to abandon the work and sue for damages, but he may proceed to complete the work and then claim damages. * * *"

In the same work on page 793 it is said:

"Where the builder is delayed by the failure of the owner duly to perform the obligations assumed by him, the fact that the builder continues the work is not a waiver of his claim for damages for such delay. * * *"

In the same work on page 914 it is stated:

"* * * although a delay or suspension of the work is made necessary by the conduct of the railroad

company, the contractor is not obliged to abandon the contract but may subsequently complete the work and recover, in addition to the contract price, the damages caused by the interruption. * * *"

This rule thus stated in three different places in C.J. and also stated in 17 C.J.S. Contracts § 502b(3) (a), p. 1060, is, we think, sustained by the great weight of authority. The rule generally applicable is stated very clearly in the case of Selden Breck Construction Co. v. Regents of University of Michigan, D.C.Mich., 274 F. 982, 985, in which it was stated as follows:

"2. It is further urged by defendant that the act of plaintiff in proceeding with, and completing, its work under the contract after the alleged breach thereof by defendant, operated as a waiver of any right to recover damages caused by such breach. I cannot agree with this contention. Consideration of the subject satisfies me that the correct rule is that upon breach of a building contract by the failure of the owner to perform his obligations under such contract, which delays the contractor in completing his work thereunder, the latter is not obliged to abandon such work, but may elect to continue therewith after such breach and, upon performance of the contract on his part, is entitled to recover the damages sustained by him as a result of the delay caused by such owner. * * *"

The rule as thus stated is, we think, fairly supported by the following authorities: Tobey v. Price, 75 Ill. 645; Weeks v. Rector, etc., of Trinity Church in City of New York, 56 App.Div. 195, 67 N.Y.S. 670; W. H. Stubbings Co. v. World's Columbian Exposition Co., 110 Ill.App. 210; Allamon v. Mayor, etc., of City of Albany, 43 Barb., N.Y. 33; Beskin v. State, 119 Misc. 209, 195 N.Y.S. 951, affirmed 206 App.Div. 784, 200 N.Y.S. 915; Florence Oil & Refining Co. v. Reeves, 13 Colo.App. 95,

56 P. 674; Snare & Triest Co. v. United States, 43 Ct. Cl. 364; Belmar Contracting Co., Inc. v. State, 110 Misc. 429, 180 N.Y.S. 494; Sheehan v. City of Pittsburg, 213 Pa. 133, 62 A. 642; Underground Const. Co. v. Sanitary Dist. of Chicago, 367 Ill. 360, 11 N.E. 2d 361, 115 A.L.R. 57; 3 Williston on Contracts, 1936, § 704; 3 Corbin on Contracts, 1951, § 755. The subject is treated quite fully in 3 Sutherland, Damages, 4th Ed., § 714, pp. 2708, 2709, where it is stated in part:

"* * * While the contract is to be regarded as furnishing the exclusive measure of compensation for the work done, the actual damages which result from the default of the employer should not fall on the contractor. * * * The right of the contractor to recover damages caused by the failure of the owner to perform on his part is not waived by proceeding with the contract as soon as he is permitted to do so and by recovering compensation under it. * * *"

While in Tobey v. Price, supra, there seems to have been a contract that the owner on account of his default should be liable for damages, the equity of the situation is stated so plainly that we cannot omit to quote from the case. At 75 Ill. 647 it is stated:

"Appellant argues, if he was tardy, and failed to furnish the iron and cut stone work seasonably, the plaintiffs could have abandoned the job, and brought their action for such damages as they incurred in not being able to complete it. But he argues, if instead of abandoning the job they elected to proceed and complete it, they will be presumed to have waived the lapse of time, and to have done the work under contract, and they can, therefore, claim only the contract price. In other words, appellant claims appellees are entitled to no damages for his delay. We know of no authority for such a position. Appellees could have abandoned the

work and brought their action for damages, but their right to proceed with the work to completion, and then claim damages, cannot be seriously questioned.

"The performance of the contract by appellees was dependent on performance by appellant, and if he neglected or failed to perform in due season his part of the contract, by which appellees were delayed in the completion of the work, to their damage, common reason suggests they should be compensated therefor. * * *"

We see no reason to disagree with all these authorities. We do not hold that damages must be paid for every delay, no matter how short the delay may be. In the case of a construction contract of any magnitude, a delay due to unforeseen circumstances is apt to arise in connection with one part of the work which will cause also a delay in another part, and that fact should be considered in determining whether or not the rule above mentioned should be applied. We merely hold herein that the delay in the case at bar was unreasonably long and should have been prevented.

It remains to consider the measure of damages in this case. Counsel for appellants, aside from the fact that they contend that appellees are not entitled to damages at all, further contend that the court erred in awarding damages to the appellees based on the rental value of the equipment of the appellees. In the case of Louisville & N. R. Co. v. Hollerbach, 105 Ind. 137, 5 N.E. 28, the court allowed as damages for the delay interest on the investment. The court herein, in addition to allowing the wages paid to the men employed by appellees while they were idle, also allowed the rental value on the equipment of appellees from July 20, 1955, to September 12, 1955, at the rates men-

tioned in Plaintiffs' Exhibit 7, Associated Equipment Distributors' Compilation of Rental Rates, 1955 edition, which gives the average rental rates in the United States. It appears by the evidence herein that the appellees might have engaged in work and used their machinery on other property but that they could not afford to let their men go or apply for other work when they were given to understand by the appellants from day to day that they would soon be required to go to work and perform their part of the contract. That the damages for delay may be awarded based on rental value has been held to be proper in Town and Country Engineering Corporation v. State, Ct.Cl., 46 N.Y.S.2d 792; Immick Co. v. State, 251 App.Div. 919, 297 N.Y.S. 623; Lowman Const. Corporation v. State, Ct.Cl., 10 N.Y.S.2d 963.

The foregoing rule allowing damages for delay, based on rental value, has its basis in the actualities of life and presupposes, of course, that the equipment would be actually let to another to be used, and when used it would be subject to normal, ordinary wear and tear. We may take judicial notice of such normal wear. The rental testified to and considered by the court is based upon items in Plaintiffs' Exhibit 7 but that rental is the gross and not the net rental. That exhibit states as follows: "The equipment rented is to be delivered to the lessee in good operating condition, and is to be returned to the lessor in the same condition as delivered, less normal wear." The normal wear and tear while in operation, when expressed in money, must accordingly be deducted from the gross rental mentioned in the exhibit. That was not done. The record is entirely silent on the subject of normal, ordinary wear. In other words, if the equipment of plaintiffs had been let to another for use, plaintiffs would at the

end of the period of letting have, say, $12,000, but would at the same time have on hand equipment which by reason of the use would be depreciated to a certain extent, and whatever the amount of that depreciation expressed in money may be that would be a loss to the plaintiffs themselves and the net amount which plaintiffs would receive would be $12,000 less such depreciation. Undoubtedly there are available experience tables of depreciation by reason of use which together with expert testimony would present a basis for the determination of this phase of the damages. For instance, we have before us a publication by the Caterpillar Tractor Company entitled "Performance Handbook" in which among other things, is given as of January 1951 the method of estimating hourly owning and operating costs of each tractor with wagon or scraper while the equipment is in operation. The depreciation, which we take to mean normal wear and tear plus obsolescence, is given separately. That publication, which seems to be of general use in the United States, figures the depreciation of each of such pieces of equipment under the most excellent conditions to be from $0.963 to $1.90 per hour. It would, on account of the difference in cost, be somewhat higher in 1955. We have not found any of plaintiffs' statistics for depreciation of other pieces of equipment but the ingenuity of counsel will doubtless find them. From what we have found, it would seem that the depreciation of the equipment of plaintiffs, if in operation, would, when expressed in money, represent a rather substantial amount. In the original petition the damages estimated by plaintiffs, aside from the amount paid to workmen, were stated at $7,079.96, while at the time of the trial they were estimated at $12,057.06. It seems that when plaintiffs made the original estimate of $7,079.96 they

may have taken into consideration the normal, ordinary wear and tear but that this item was entirely forgotten at the time of the trial.

Even though there probably is available standard information upon which there could be based a determination regarding depreciation of the machinery by use, it is not a matter of which we can take judicial notice.

Moreover the adjudication of the depreciation as to its relative component parts might depend upon factors other than those in accepted compilations. This is then a matter which must be resolved by a district court upon the presentation of proper evidence. Accordingly, we must reverse the judgment as to the amount of damages from delay, aside from the amount paid to workmen, and remand the case to the district court for the determination of the one item of depreciation, that is to say normal wear, directing a new judgment to be entered when that item has been satisfactorily shown and deducted from the present judgment herein. In all other respects the judgment is affirmed.

In part affirmed.

In part modified.