Argued November 13, 1947; Reargued January 23, Affirmed
June 2, 1948.

# DORSEY *v.* OREGON MOTOR STAGES

194 P. (2d) 967

*J. S. Middleton,* of Portland, argued the cause and filed a brief for appellant.

*John J. Coughlin,* of Portland, argued the cause for respondent. With him on the brief were Griffith, Peck, Phillips & Nelson, and C. T. Terrill, of Portland.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY, BRAND and HAY, Justices.

ROSSMAN, C. J.

This is an appeal by the plaintiff from a judgment of the Circuit Court which was entered in an action based upon an alleged breach of a contract signed by the parties June 16, 1942, and amended by a supplementary agreement November 11, 1943.

The appellant presents two assignments of error. The first is:

"The trial court erred in finding and adjudicating that Respondent fully complied with the terms of its contract with Appellant, and that Appellant failed to establish breach thereof."

The second is:

"The trial court erred in finding and decreeing that the use by Respondent of the United States owned busses was required by the military authorities of the United States and that Respondent was compelled to use said busses and that such busses were not busses of third parties within the meaning of the contract and that the use of such busses by Respondent did not constitute a breach of contract."

The appellant was engaged in the business of transporting by motor busses pupils to the high schools in Albany and Corvallis. The respondent was a common carrier of passengers by busses.

Prior to the execution of the contract the United States Army commenced the construction of Camp Adair upon a site a few miles outside of both Albany and Corvallis. The site was not upon a straight line drawn between the two cities, but was accessible to both. When construction of the camp was begun the respondent provided transportation for the camp. The building of the camp gave employment to large numbers of men, and after it was completed tens of thousands of soldiers were stationed there.

The contract upon which this case is predicated recites facts which, when epitomized, are that the transportation demands of the area served by the respondent, as expanded by the transportation needs of the employees in the Portland shipyards and the

soldiers and civilians at Camp Adair, render it impossible for the respondent's equipment to serve the needs. The agreement mentions particularly the heavy demands for transportation on Saturdays, Sundays and holidays by the soldiers stationed at Camp Adair. The instrument expresses its purpose as follows:

"The purpose of this agreement, therefore, is to meet the equipment emergency above outlined, to the end that * * *."

Before going on with a further delineation of the provisions of the agreement we pause to state that prior to the construction of Camp Adair the respondent ran no busses into that place. It maintained schedules between Corvallis and Albany, but the busses which served them ran upon a highway which was virtually a straight line. The distance was twelve miles. The roundabout course between Albany and Corvallis through Camp Adair was twenty-one miles.

The parts of the agreement which are germane to the assignments of error required the appellant (1) to apply for a permit authorizing him to operate his school busses between Corvallis and Camp Adair until September 19, 1942, and (2) to discontinue, on September 19, 1942, the operation of his busses between Corvallis and Camp Adair. The same portion of the agreement required the respondent to resume service between the two points just mentioned on September 19, 1942. The only other covenant which needs mention is the very one upon which this cause is based and which we shall now state. Referring to the respondent as Stages and to the appellant by the name of Dorsey, it says:

"* * * Stages agrees that during the life of this agreement it will not lease or use busses of

a third party for the operation of local schedules between Corvallis and Camp Adair, except unless at least five (5) of the six (6) busses owned by Dorsey shall at the time be operating under the terms of this lease in the service of Stages.''

In short, the respondent bound itself to use the appellant's school busses upon the ''local schedules between Corvallis and Camp Adair'' to the exclusion of the busses of third parties whenever its own proved inadequate. As we shall presently see, the meaning of the term ''local schedules'', as used in the quoted sentence, is important. The remaining parts of the agreement are immaterial to the issues before us.

The alleged breach is set forth in a paragraph which declares that the respondent, commencing in May, 1943, used busses belonging to ''third parties for the operation of local schedules between Corvallis and Camp Adair while varying numbers of the six busses owned by Plaintiff * * * were not operating.'' The complaint sought $35,000.00 damages.

The answer, after admitting the execution of the agreement, denied the paragraph of the complaint which alleged a breach. By way of affirmative defense, the answer states that

''due to heavy and unforeseen traffic consisting of military personnel * * * the agencies of the United States of America required the defendant to lease and use United States owned vehicles in the transportation of passengers between Camp Adair and Corvallis, Oregon, and the defendant in compliance with the orders and directions of the agencies of the United States was required to and did lease from the United States busses owned by the United States and as ordered by military authorities operated said busses between Corvallis and Camp Adair, Oregon.''

It also alleged:

"Plaintiff should be enjoined from prosecuting his claim for an accounting and for judgment and decree against the defendant."

The prayer, in addition to asking for a judgment in favor of the defendant, sought a decree "enjoining the plaintiff from further prosecuting his claim."

Appellant's claim that the respondent breached the agreement is based upon the fact that on April 5, 1943, the respondent and the Government executed a contract whereby the Government leased to the respondent seventeen semi-trailer busses and the respondent, upon their receipt, put them into operation between Corvallis and Albany by way of Camp Adair. When those busses went into operation the appellant's vehicles stood idle frequently.

By reverting to one of the provisions in the agreement quoted in a preceding paragraph, it will be seen that it says the respondent "shall not lease or use busses of a third party for the operation of local schedules between Corvallis and Camp Adair except * * *." The respondent claims that its use of the Government semi-trailer busses did not constitute a breach of its agreement with the appellant for the following reasons: (1) the Government required it to accept and operate the Government-owned vehicles; (2) the Government was not "a third party" within the contemplation of the agreement between the appellant and the respondent; and (3) the Government vehicles were operated between Corvallis and Albany by way of Camp Adair and were, therefore, not employed upon "local schedules between Corvallis and Camp Adair."

The findings of fact entered by the Circuit Court include the following:

"That the term 'local schedules' as used in said contract dated June 16, 1942 was intended by the parties to mean and did mean schedules originating in Corvallis, Oregon and bound for Camp Adair, and schedules originating in Camp Adair and bound for Corvallis, Oregon, and that the said term was not intended to mean or apply to local traffic or passengers who might travel beyond or between said points."

"The court further finds that the use by the defendant of United States owned busses was required by the military authorities of the United States and that the defendant was compelled to use said busses, and that said United States owned busses were not busses of third parties within the meaning of said contract of June 16, 1942, and the court further finds that the use of United States owned busses was not a breach of the said agreements between the plaintiff and defendant."

■ The foregoing findings have the effect of a verdict rendered by a jury, if this is a law action: *Silvertooth v. Kelley*, 162 Or. 381, 91 P. 2d 1112, 122 A. L. R. 1329. The appellant does not challenge the well-established rule just mentioned, but contends that "the whole trial of this cause in the circuit court was on the equity side of the court because the equitable issues were resolved in favor of defendant and the court never had opportunity to take up the law side of the case after disposing of the equitable issues."

■ We deem it necessary to determine whether the foregoing findings were made by the trial judge in his capacity as a chancellor or as the presiding magistrate of a law court. If the findings are those of an equity

judge, they are not binding upon us, and it is our duty to try *de novo* the issues resolved by them. But if the findings are those of a law court, then, as we have already indicated, they are entitled to the respect accorded a jury's verdict.

The affirmative answer, as is shown by the paragraph which we quoted from it, alleged that Federal agencies required the respondent to lease the Government-owned busses and operate them in Camp Adair service. Restatement of the Law, Contracts, § 458, states:

> "A contractual duty or a duty to make compensation is discharged, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty, where performance is subsequently prevented or prohibited
>
> "(a) * * *
>
> "(b) by a judicial, executive or administrative order made with due authority by a judge or other officer of the United States, or of any one of the United States."

Williston on Contracts, Rev. Ed., § 1939, says:

> "Clearly, prevention by an executive and administrative order designed for the benefit of the general public may be considered excusable impossibility whether the order is directed to the general public or to an individual."

■ It is, of course, clear that a contract is at an end when further performance of it is rendered illegal by a change in law: *Louisville & Nashville R. R. Co. v. Mottley*, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; *Crane v. School District No. 14*, 95 Or. 644, 188 P. 712; and Williston on Contracts, Rev. Ed., § 1938.

■ Even the doctrine known in England as "commercial frustration" and in America as "supervening impossibility of performance" is not based upon equitable principles, but is a development of the law courts: Williston on Contracts, Rev. Ed., § 1953; *Metropolitan Water Board v. Dick, Kerr & Co.* (1918), A. C. 119; and annotation 137 A. L. R., 1199 at 1217. In construing contracts the doctrine just mentioned reads into them, in the absence of repellent circumstances, an implied condition that the promisor shall be absolved from performance if, through a supervening circumstance for which neither party is responsible, a thing, event or condition which was essential so that performance would yield to the promisor the result which the parties intended him to receive, fails: *Cabell v. Federal Land Bank of Spokane,* 173 Or. 11, 144 P. 2d 297; *Strong v. Moore,* 105 Or. 12, 207 P. 179, 23 A. L. R. 1217; *Crane v. School District No. 14,* supra; *Elmore v. Stephens-Russell Co.,* 88 Or. 509, 171 P. 763; *Powell v. Dayton & Sheridan G. R. R. Co.,* 12 Or. 488, 8 P. 544; *Metropolitan Water Board v. Dick, Kerr & Co.,* supra; *Parrish v. Stratton Cripple Creek Mining & D. Co.,* 116 Fed. 2d·207; Williston on Contracts, Rev. Ed., § 1937; annotation 74 A. L. R. 1289; and 17 C. J. S., Contracts, § 463 (b). The basis of the implied condition to which Williston refers as "impossibility, masquerading as a condition of the contract" is explained by that authority in the following words:

"* * * As the basis for the defense of mistake is the presumed assumption by the parties of some vital supposed fact, so the basis of the defense of impossibility is the presumed mutual assumption when the contract is made that some fact essential to performance then exists, or that it will exist when the time for performance arrives." § 1937.

It is seen from the foregoing that the basis of the doctrine is not an equitable principle, but nothing other than the rules governing the construction of contracts.

■ The above renders it clear, we believe, that the legal principles which govern the defense are not equitable. Since they are not equitable, it follows that the part of the answer upon which the appellant depends to support his contention that "the equitable issues were resolved in favor of the defendant" fails him. The quoted findings, therefore, are those of a law court. Such being their nature, they are binding upon us, if supported by substantial evidence.

We now return to the first attacked finding. It concerns itself with the meaning of the term "local schedules" as employed in the contract. The crucial clause of the contract, as quoted in a preceding paragraph, includes the term "local schedules" and forbids the respondent from using busses "of a third party for the operation of local schedules between Corvallis and Camp Adair." The question with which the finding is concerned is whether the respondent's operation of the Government-owned vehicles upon runs between Corvallis and Albany through Camp Adair was the employment of them in "local schedules between Corvallis and Camp Adair."

■ As is said in Williston on Contracts, Rev. Ed. § 616:

"It is obvious that the meaning of language is a question of fact. The code or standard by which it is sought to test the meaning must be discovered frequently by evidence of the facts and circumstances concerning the making of the contract. Even though the question concerns merely the normal meaning of a word as found in dictionaries, it is still a question of fact, if the word 'fact' is used in a literal sense."

In *Utica City National Bank v. Gunn*, 222 N. Y. 204, 118 N. E. 607, it is said:

> "* * * The triers of the facts must fix the sense in which the words were used in the contract * * *."

See also 17 C. J. S., Contracts, § 621, page 1290. Accordingly, the meaning of the term "local schedules" was the proper subject matter for a finding of facts.

The appellant claims that the operation by the respondent of the Government-owned busses upon the run between Corvallis and Albany through Camp Adair violated the clause previously quoted because, according to him, (a) a passenger who boarded the bus in Corvallis for Camp Adair was carried upon a local schedule, and (b) the operation between Corvallis and Albany by way of Camp Adair was a subterfuge schedule to which the respondent resorted in order to circumvent the above-quoted provision of the contract.

The drafting of legal instruments consists of the packaging of ideas. Generally, the only package material which the law affords the draftsman consists of words and phrases. But words and phrases are chameleon-like. Their color, significance and connotation are frequently dependent upon their user: *Hurst v. Lake & Co.*, 141 Or. 306, 16 P. 2d 627; Wigmore on Evidence, 3d ed., § 2640; Williston on Contracts, Rev. Ed., § 650. In view of the facts to which we have just alluded, the use of words frequently presents a greater problem for the interpreter than for the draftsman. Such being true, a rule of construction which our legislature placed into statutory form says:

> "The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they

have a technical, local, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement shall be construed accordingly." § 2-219, O. C. L. A.

In order to afford an adequate basis for a determination of the meaning of "local schedules," it is necessary to take note of some additional evidence "so that the judge may be placed in the position of those whose language" is to be construed. The words just quoted are those of § 2-218, O. C. L. A.

The record indicates that the drafting of the contract which underlies this cause was done by counsel for both parties, but that in the work counsel for the respondent played the leading part; the words were largely his. However, the appellant, as well as the respondent, had had experience in the transportation business. He entered the business in 1919. For fourteen years he operated as a common carrier between Corvallis and Waldport. His experience in the procurement of permits and in the filing of schedules and tariffs must have acquainted him with the terms used by transportation men.

Although the respondent ran its busses from Corvallis to Albany through Camp Adair and turned them around at Albany for the return trip to Corvallis, the Commander at Camp Adair prohibited the respondent from selling through tickets. A ticket entitled its holder to go no further than Camp Adair. When he reached that point he alighted and purchased another ticket if he wished to go further. The purpose was to enable the Military Police at the camp to inspect the credentials of the passengers.

A part of Camp Adair was a hospital located near the west gate of the camp, that is, the gate nearest

Corvallis. At the other extremity of the camp, that is, at the gate nearest Albany, was the laundry. Near the center of the camp was the respondent's depot. The distance from the hospital to the depot was two and one-half miles. Having in mind those facts, we turn to the testimony of Mr. M. A. Reed, general manager of the respondent when the Camp Adair service was inaugurated:

"A. When we first started in on the operations there I tried to have it so that drivers from Albany to Corvallis could just run out to the depot at Camp Adair and back in order for them to be home all the time, but it didn't prove very satisfactory. We had a lot of nurses and cooks and other personnel working in the hospital that lived in Albany and also at the laundry there were workers from Corvallis, so Captain Carter told us—asked us to draw up our schedules putting them right through from Albany to Corvallis so that the people at the hospital and laundry would not have to change busses at the depot.

"Q. Who was Captain Carter?

"A. He was head of transportation at Camp Adair.''

That uncontradicted testimony shows that at the outset the respondent operated its busses from Corvallis to Camp Adair and returned them to Corvallis without having them go on to Albany. That testimony also shows that it was at the request of the transportation officer at the camp that the respondent discontinued the arrangement and inauagurated the schedules whereby the busses ran all the way between the two cities through the camp. From Mr. Reed's quoted testimony it further appears that before the respondent had any intimation concerning the Government busses it had already instituted the practice of operating its busses, not on schedules between the camp and

either of the cities, but on through schedules which ran the busses between the two cities by way of Camp Adair. The same witness, speaking of the later time when the respondent received the Government-owned busses, testified:

"Captain Carter suggested to us that we put them on the run between—on the through runs between Albany and Corvallis."

The above-quoted testimony of Mr. Reed, which was not contradicted, shows that the operation of the busses on the schedules which ran through Camp Adair was instituted at the request of the military officer who was head of transportation at the camp.

After Captain Carter had made his request for through service, the respondent prepared through tariffs for the transportation of passengers between Corvallis and Albany via Camp Adair, but when it developed that the military authorities did not wish through tickets sold, the tariff was not filed.

When the Camp Adair service was inaugurated, the busses which left Corvallis entered Camp Adair at the hospital entrance. Military Police were stationed there and inspected the credentials of the passengers. Men in uniform were not required to alight. In the early months of the camp the respondent maintained a ticket office at the hospital gate and passengers who purchased tickets at that place were permitted to continue on their way to Albany, if that was their destination. Military Police were also stationed at the laundry entrance and passengers who were heading for Albany could board the bus at that entrance. Later, the respondent discontinued the sale of tickets at the camp entrances and the Military Police thereafter made their inspection of the passengers' credentials at the camp's bus depot.

Mr. Paul Farrens, a witness for the respondent, was its counsel when the contract was prepared. As a witness, Mr. Farrens recounted the extensive service he had performed for corporations which were engaged in the transportation business. Some of his clients were railroads and others were bus lines. His experience qualified him as an expert concerning transportation matters. Mr. Farrens testified:

"The word 'schedule' has various meanings under various circumstances, but in the transportation world it has a specific meaning. A schedule is the movement of a vehicle between specified termini, and by 'termini' I mean in the one instance the point at which the movement of a vehicle begins and in the second instance, the point at which it finally terminates. It may be over a part of a route, all of a route, or over several routes. It has nothing to do with the movement of passengers, the transfer of train crews or drivers, or even the transfers of engines on trains. It is the movement of the vehicle or combination of vehicles from the point of beginning of movement to the point where it ends."

He swore that "local schedules between Corvallis and Camp Adair" did not include an operation wherein the vehicle ran from Corvallis to Albany.

We have mentioned Mr. M. A. Reed. He testified:

"Q. Would you say that a schedule beginning at Corvallis and terminating at Camp Adair would be a local schedule?

"A. It is.

"Q. What would you say as to whether or not a schedule beginning at Corvallis and terminating at Albany would be a local schedule between Corvallis and Camp Adair?

"A. No, it wouldn't."

Other expert witnesses supported the testimony of Mr. Farrens and Mr. Reed. The appellant is the only

one who swore that the carriage of passengers from Corvallis to Camp Adair upon busses which operated between Corvallis and Albany by way of Camp Adair was the employment of a local schedule. He testified:

"My understanding of the language that was used in that contract at the time it was written up in Mr. Farrens' office in Portland was that local schedules was to cover all operation between Camp Adair and Corvallis."

That is all that the appellant said upon the subject. He said nothing more. It will be noticed that he did not claim that he acquainted the respondent's officials with his personal understanding of the meaning of "local schedules", nor did he contend that others in the industry used the term in the same manner as he. In short, he went no further than to give "my understanding of the language"—an understanding which he did not convey to the respondent.

Although the appellant gave that testimony, we observe that one of his witnesses, who was an employee of the respondent during the Camp Adair service, testified:

"Q. That was Corvallis to Albany via Adair schedule?

"A. Yes.

"Q. But that was a through schedule that way as you worked it then?

"A. That's right.

"Q. By that I mean you were not working strictly on a local schedule between Corvallis and Adair?

"A. No, I had a round trip schedule."

The foregoing, we think, is a resume of all testimony essential to an interpretation of the meaning of the contested clause.

The appellant particularly relies upon § 2-222, O. C. L. A., which reads:

"When the terms of an agreement have been intended in a different sense by the different parties to it, that sense is to prevail, against either party, in which he supposed the other understood it; and when different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made."

The appellant also relies upon *Salem King's Products Co. v. Ramp,* 100 Or. 329, 196 P. 409; *Allen v. Hendrick,* 104 Or. 202, 206 P. 733; *Harvey v. Campbell,* 107 Or. 373, 209 P. 107, 214 P. 348; and *First National Bank v. United States F. & G. Co.,* 127 Or. 147, 271 P. 56. Those cases can be distinguished from this one on the premise that none of them was controlled by the controverted meaning of a trade, industrial or technical term.

Restatement of the Law, Contracts, § 235, says:

"The following rules aid the application of the standard stated in § 230-233.

"(a) * * *

"(b) Technical terms and words of art are given their technical meaning unless the context or a usage which is applicable indicate a different meaning."

See, also, Williston on Contracts, Rev. Ed., § 618.

Section 230, which is cited in the language just quoted, says:

"The standard of interpretation of an integration, except where it produces an ambiguous result, * * * is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing

all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean.''

Section 235 is applicable to unintegrated agreements.

■ Obviously, the phrase, ''local schedules'' is an expression of the kind which § 235 of the Restatement deems a technical term or a word of art. The agreement before us, in addition to using the term just mentioned, contains many others of like kind. A few are: ''fixed termini carrier'', ''Public Utilities Commissioner permit'', ''certificate of public convenience and necessity'', ''normal weekday movement'', ''equipment emergency'', ''regular line haul bus schedules'', ''anywhere for hire common carrier'', and ''rate per bus mile''. Plainly, the draftsman of the instrument couched it in the technical language of transportation men and was possibly thinking of the ''lawyer's paradise'' pictured in Thayer's Preliminary Treatise on Evidence (see Wigmore on Evidence, 3d ed., § 2462), ''where all words have a fixed precisely ascertained meaning.'' The draftsman very likely was influenced by his knowledge that those who would sign were transportation men.

■ Wigmore on Evidence (2d ed.), § 2464, speaking of trade terms, says:

''Where all the parties are members of the same trade or other circle of persons, little difficulty can arise; the only requirement is that the special use alleged should be in fact a usage, or settled habit of expression, and not merely the expression of a few persons or of casual occasions.''

Before the appellant signed the instrument he had the counsel of his capable attorney who had participated in

the drafting of the paper. It is true that the appellant said that, in his opinion, the contested phrase did not possess the meaning attributed to it by the other witnesses; nevertheless, it remains a conceded fact that the phrase is a technical term and that the appellant is a member of the industry which employs it as a part of its vocabulary. Courts infer that members of a vocation employ its trade terms in their technical sense whenever they use them: *Hurst v. Lake & Co.*, supra, and 17 C. J. S., Contracts, § 302.

■ It is our belief that the challenged finding is supported by substantial evidence, and that the applicable rules of construction justified the trial judge in attributing to the term "local schedules" a meaning which excluded from its embrace the operation of busses which ran between Corvallis and Albany via Camp Adair. It follows from that conclusion that the Circuit Court's finding is controlling upon us.

We believe that the Circuit Court properly construed the contract which the parties hereto signed.

Although the foregoing could suffice for an affirmance of the challenged judgment, we shall go on and consider the propriety of the other questioned finding; that is, the one which declares:

"The use by the defendant of United States owned busses was required by the military authorities of the United States and that the defendant was compelled to use said busses."

It also says:

"The use of United States owned busses was not a breach of the said agreement between the plaintiff and defendant."

The appellant claims that the respondent was free to sign the Government lease or not according to its

own wishes and that when it signed the lease it acted upon its own volition. It will be recalled that the lease was signed April 5, 1943. According to the appellant's brief, the respondent used the semi-trailers because the rental upon them was less than that payable for the use of the appellant's school busses. If that is a fact, no witness mentioned it. The appellant argues that the respondent's use of the Government-owned busses was a violation of the agreement which the appellant and respondent signed June 16, 1942.

In proceeding, we should bear in mind that the contract between the appellant and the respondent did not contemplate that the school busses would be in constant use between Corvallis and Camp Adair. The parties intended the appellant to use his equipment upon school days in the fulfillment of his school contracts, but the appellant urges that if the respondent had not accepted the Government vehicles his school busses would have been used to a greater extent on weekends and in the evenings.

We now turn to the lease of April 5, 1943, to which the parties were the respondent and the United States Government. The latter's signature was written by an Army officer who identified himself in signing as "1st Lt. Q.M.C., Purchasing and Contracting Officer." The instrument states that it was authorized and negotiated under authority of "the Act of December 1, 1942 (Public Law 779—77th Congress), The First War Powers, 1941, and Executive Order No. 9001, December 27, 1941."

Before going on, we pause to explain that the appellant does not question the legality of the lease which the respondent and the Government signed, nor does he contend that the Government officials who signed

the paper lacked authority so to do. If he challenges the validity of any statute or administrative ruling under which the officials acted, that fact has not been indicated to us. His sole contention is that the respondent, in entering into the agreement, was not forced by the Government to do so.

■ The Government's unfettered power in time of war to requisition property and services essential to the war effort is clear. For instance, as long ago as the Mexican war Chief Justice Taney, in *Mitchell v. Harmony*, 13 How. 115, 14 L. Ed. 75, said:

> "There are, without doubt, occasions in which private property may lawfully be taken possession of * * * to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service or take it for public use."

*International Paper Co. v. United States*, 282 U. S. 399, 75 L. Ed. 410, 51 S. Ct. 177, is a recent illustration of the employment of that rule. In that instance, the Government requisitioned all of the electrical power produced by a power company. See, generally, 56 Am. Jur., War, § 32, page 158.

The Act of December 1, 1942, mentioned in the language which we quoted from the Government lease, being 56 Stat. 1024, provides:

> "* * * whenever during the continuance of the present war the Secretary of War, the Secretary of the Navy, * * * shall determine that the effective conduct of the affairs of his department or agency in connection with the prosecution of war requires assured and adequate transportation facilities to and from their places of employment for personnel attached to or employed by such

department or agency, including personnel attached to or employed by private plants engaged in the manufacture of war material, he is hereby authorized in the absence of adequate private or other facilities to provide such transportation, by motor vehicle or water carrier, subject, however, to the following provisions and conditions:

"1. The equipment required to provide such transportation facilities may be either purchased, leased, or chartered for operation by the War Department, * * * and when so obtained may be maintained and operated either by enlisted personnel, civil employees of the War Department, * * * or by private personnel under contract with such departments or agency. Equipment so obtained may also be leased or chartered to private or public carriers for operation under such terms and conditions as the Secretary of War, * * * shall determine necessary and advisable under the existing circumstances: * * *

"2. That in each case where transportation facilities are provided hereunder, reasonable rates of fare * * * shall be established * * *.

* * *

"4. The authority herein granted the Secretary of War, * * * shall be exercised in each case only after a determination by the Office of Defense Transportation that existing private and other facilities are not and cannot be rendered adequate * * *."

Executive Order No. 9001 (see Executive Orders and Administrative Material, 1945, page 164), which is also mentioned in the language which we quoted from the lease agreement, was issued by the President December 27, 1941. It states that it was promulgated by an act of Congress enacted December 18, 1941. That act, which is known as First War Powers Act, 1941, is 55 Stat. 838. Title I, § 1, of the act confers upon

the President, as Commander in Chief, authority to make such redistribution of functions among executive agencies as he may deem necessary for the more effective prosecution of the war. Title 2 says:

"The President may authorize any department or agency of the Government exercising functions in connection with the prosecution of the war effort, in accordance with regulations prescribed by the President for the protection of the interests of the Government, to enter into contracts and into amendments or modifications of contracts heretofore or hereafter made and to make advance, progress and other payments thereon, without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war:   *   *   *."

■ The purpose of that provision, obviously, was to enable those who were subordinates to the President, either in his capacity as Chief Executive or in his other capacity as Commander in Chief, to contract freely for all supplies and services needed to facilitate the prosecution of the war.

■ Executive Order No. 9001, which was signed by the President December 27, 1941, set up the administrative procedure whereby the powers just mentioned could be exercised effectively. It said, in part:

"The contracts hereby authorized to be made include agreements of all kinds (whether in the form of letters of intent, purchase orders, or otherwise) for all types and kinds of things and services necessary, appropriate or convenient for the prosecution of war   *   *   *."

Manifestly, the authority there expressed included authority to effect the agreement we are now considering.

We return to the aforementioned lease, which was signed by the Government and the respondent April 5, 1943. It says:

"WITNESSETH:

"WHEREAS, it has been determined that the effective conduct of the affairs of the War Department in connection with the prosecution of the war requires assured and adequate transportation facilities to and from Camp Adair, Oregon (hereinafter called the Plant) for personnel attached to or employed by The War Department, and authorized civilians.

"WHEREAS, there is now an absence of adequate private and other facilities to provide such transportation, and

"WHEREAS, the Office of Defense Transportation has determined that existing private and other facilities are not and cannot be rendered adequate by means other than those hereinafter provided for, and that the provisions hereinafter made will result in the most efficient method of supplying transportation to the personnel concerned and a utilization of transportation facilities consistent with the plans, policies and programs of the Office of Defense Transportation.

"NOW, THEREFORE, the parties hereto do mutually agree as follows * * *."

At that point follow the terms of the lease.

The foregoing is a finding that the transportation facilities at Camp Adair were inadequate and that, according to the Office of Defense Transportation, they could be made adequate only by the means which the lease would usher in. The significance of those findings is enhanced when note is taken of the fact that the instrument bears the approval of C. L. Carter and Donald F. McCarthy, who were the Army officers in charge of transportation facilities at the camp.

The Office of Defense Transportation was created by Executive Order No. 8989 December 18, 1941. See Executive Orders and Administrative Material 1945, p. 117. It recited that the President, in creating the Office of Defense Transportation, acted as "President of the United States and Commander in Chief of the Army and Navy." The order placed at the head of the Office of Defense Transportation a director, and declared that he "shall discharge and perform his responsibilities and authorities under the direction and supervision of the President." The powers conferred upon the director by Order No. 8989 were shortly supplemented by additional grants of authority made by other executive orders. Three of them were No. 9156, No. 9214 and No. 9294. They issued, respectively, on May 2, 1942, August 5, 1942, and January 4, 1943. See Executive Orders and Administrative Material 1945, pp. 117, 118 and 119, respectively.

In addition to the foregoing orders which conferred authority upon the director, other executive orders, of which No. 9024 is an example (Executive Orders and Administrative Material 1945, p. 190) gave the director additional powers by making him a member of other war agencies. The order just cited made him a member of the War Production Board. Still other executive orders, of which No. 9246 (Executive Orders and Administrative Material, 1945, p. 192) is an illustration, enabled the director to share in powers primarily conferred upon other boards. That order was concerned with the rubber program. The director's powers were further expanded by directives issued by other agencies. An illustration is a directive which was issued by the War Production Board (13 L. W. 2008) and which provided that "rationing of new trucks and

other commercial vehicles is turned over to the Office of Defense Transportation."

A survey herein of the extensive powers conferred upon the Office of Defense Transportation would prolong this opinion to great length. Many of the orders interlocked with others. The orders conferred powers upon the director in terms which were general and sweeping. The use of the broad language was very likely chosen in order to invest the director with all authority over transportation units which served the armed forces and the war industries except the powers possessed by the armed forces. We shall take note of some provisions which are illustrative. Order 8989 directed the Office of Defense Transportation to "coordinate and direct domestic traffic movements with the objective of preventing possible points of traffic congestion and assuring the orderly and expeditious movement of men, materials and supplies to points of need." No. 9156 said:

> "In addition to the functions, duties and powers conferred upon it * * * the Office of Defense Transportation shall * * * formulate measures to conserve and assure maximum utilization of the existing supply of civilian transport services dependent upon rubber, including the limitation of the use of rubber-borne transportation facilities in nonessential civilian activities, and regulation of the use or distribution of such transportation facilities among essential activities."

No. 9294 stated:

> "In addition to the functions, duties and powers conferred upon it * * * the Office of Defense Transportation shall * * * review and approve such contracts, agreements or arrangements hereafter made by Federal departments and agencies

* * * for the purchase, lease, requisition or use of new or used local passenger transportation equipment * * *.

"No Federal department or agency * * * shall hereafter complete arrangements for the purchase, lease, requisition or use of local passenger transportation equipment without giving prior notice thereof to the Office of Defense Transportation, and if the Director considers it necessary without submitting the contract, agreement or arrangement to the Office of Defense Transportation for review and approval * * *."

According to the record, the Government at the outbreak of the war took charge of the available supply of all new automobiles, busses and trucks. As we have seen, the Office of Defense Transportation was entrusted with the responsibility of determining the merits of applications for motor cars and equipment. It is agreed that although the respondent, when the war broke out, had orders with manufacturers for many busses, it was unable to obtain any equipment whatever.

We shall have occasion to mention the testimony of Mr. F. E. Landsburg and of Mr. Carl Wendt. The former was district director of the motor carrier department of the Interstate Commerce Commission and state representative of the Office of Defense Transportation. Mr. Wendt was assistant regional director of the Office of Defense Transportation. Each conducted an inquiry into the adequacy of transportation facilities for Camp Adair. The report of each showed that the available facilities were inadequate. Mr. Landsburg testified:

"* * * it became obvious that the carrier which served that point would probably be unable to take care of the demands of the military. Those demands finally got to the point where two generals in com-

mand of the two divisions there at Adair requested us to arrange for the transportation of at least 15,000 men each week into Portland.''

He explained that the commanding officers were anxious that facilities be provided so that each weekend those in the camp could visit the nearby cities. Mr. Landsburg swore:

''\* \* \* the Government was very, very much opposed to any operator using any school bus equipment during that period for the simple reason we had 135 applications for school bus equipment in our office which we could not supply, and school busses were run-down and in dangerous condition, and we were opposed to having anybody use school busses in connection with military effort.''

Continuing, the witness testified:

''I made three investigations personally at Adair in connection with the officers there. We determined we needed 60 busses to handle the requirements of that installation over and above the usual services that Camp Adair had available. We recommended to the Army that 60 busses be allocated to the Camp Command at Adair.''

Mr. Wendt concurred in all of Mr. Landsburg's findings, but the recommendation that 60 busses be allotted to Camp. Adair was not adopted by the superiors of the two men. The vehicles allocated were the 17 semi-trailers which we have already mentioned. When the officer in charge of transportation facilities at Camp Adair was informed that the camp would receive the vehicles he became interested in knowing how they could be operated and sent for Mr. Landsburg. We now quote again from that witness's testimony:

''We discussed the problem as to how those busses should be handled, and there were several

ways at that time that they could be handled under the army instructions and under the instructions of O.D.T. One of those ways was for the Camp Command to run the busses himself and use military personnel in the handling of those busses. The other way was to have the Post Exchange operate the busses. * * * And the third way was for Camp Command to enter into a contract with somebody to operate those busses on behalf of the Command of the Camp. It was my recommendation to the Colonel that he enter into a contract with the carrier which was authorized to serve the Camp to operate those busses on a contractual basis."

In that recommendation Mr. Wendt concurred. We now continue our quotation from Mr. Landsburg's testimony:

"That arrangement was finally accepted by the Colonel, and he decided to do that with the understanding that he would at all times maintain complete control over those units, * * *."

When the Army officers in charge of transportation at Camp Adair had decided that the respondent should operate the Government-owned busses, the Office of Defense Transportation prepared the lease contract which is now under consideration, and it was submitted to the respondent.

Mr. Landsburg testified that if the respondent had declined to sign the lease

"we, representing the Federal Government, would immediately authorize another carrier to serve Camp Adair * * *. In other words, it was a situation where either Oregon Motor Stages had to operate those busses or face operation by the Camp, by the Post Exchange or by a competing carrier * * *. We did not say to Oregon Motor Stages, you must do this thing, but ultimately they were in a position where they either had to do it or get out of the business."

Upon cross-examination, Mr. Landsburg was asked whether his office exerted compulsion upon the respondent to induce it to accept the Government-owned equipment. He answered "no" and his negative answer is stressed by the appellant. But, in answering no, he added:

"A. If Oregon Motor Stages said they wouldn't take it, there would have been compulsion; we would have had to come in and authorize another carrier to serve the camp.

"Q. That compulsion would have consisted in your authorization to another carrier to rent those busses and perform this same service?

"A. Not rent the busses, but enter into a contract to operate the busses.

"Q. The compulsion would have consisted in giving another carrier the right to do what you first extended to the Oregon Motor Stages?

"A. That's right.

"Q. No more and no less?

"A. We would probably have issued a certificate to that carrier to serve the camp in addition to having them run the equipment.

"Q. The effect on Oregon Motor Stages if they had not wished to take the contract would have been the result of getting a competitive carrier for that particular business?

"A. That's right, for that is a military reservation and the Command could have said to that Company, 'You will not come into this camp—you will stop entry.' "

Mr. Wendt explained the manner in which the Office of Defense Transportation was authorized to seize and operate carriers which failed to render adequate service. "We had the right," he swore, "under Order 35 to commandeer any equipment in the United States which we deemed necessary" to assure good transportation service. Although he said that he exerted no

coercion upon the respondent, he explained that "in the background there was always that Order 35 which said if you don't you better." He swore:

"The only reason the equipment was put in there in the first place was to insure the service to the camp, and it was mandatory upon the operator that equipment so contracted for should be operated and used."

One of the respondent's officials, upon cross-examination, testified as follows:

"Q. Did they tell you you must furnish service to Camp Adair?

"A. They told us we had to furnish service to Camp Adair or stay out of the cantonment.

"Q. So that you had two alternatives, to stay out or to furnish service?

"A. Correct.

"Q. Who told you that?

"A. The Commanding Officer at that time whom I think was McCoy. I believe that was his name.

"Q. You didn't hear that from Mr. Landsburg?

"A. No.

"Q. Did he say what would happen to you if you stayed out of the cantonment?

"A. Yes.

"Q. What did he say would happen to you then?

"A. He said that we were rendering services in other parts of the territory in which we served for other government establishments and we would suffer consequences accordingly.

"Q. So he threatened you they would take their business somewhere else?

"A. You can take it as you will.

"Q. Is that what he was saying, in plain language?

"A. I believe you would be as good a judge of that as I would.

"Q. Was there any other means of compulsion applied to you to undertake this semi-trailer contract?

"A. No."

It was in the manner we have just described that the contract between the Government and the respondent was brought about. None of the above testimony was contradicted by anyone.

After the equipment was delivered to the respondent, officials of the Office of Defense Transportation periodically visited Camp Adair so as to assure themselves that the equipment was being constantly used.

The foregoing are the facts which indicate whether the respondent signed the lease agreement voluntarily and thereby breached its contract with the appellant, or whether, in signing the lease, it submitted to the lawful demands of the Army officers. It is plain that before the lease was presented to the respondent the Government, acting through its duly authorized officials, (1) had investigated the transportation facilities at Camp Adair and had found them inadequate, (2) had decided to place in the Camp service 17 Government-owned busses, and (3) had decided to exclude the respondent from Camp Adair if it refused to operate the Government busses. The respondent was not consulted when those decisions were reached and knew nothing about the investigations when they were under way.

It is clear that 56 Stat. 1024, the pertinent parts of which are quoted on a preceding page, authorized the Army officers, aided by the Office of Defense Transportation, to take the course and reach the decisions just mentioned. That statute (1) authorized the Office of Defense Transportation to make its investigations

into the adequacy of the transportation facilities at Camp Adair and report thereon to the Army officers, (2) authorized the Army officers, upon receipt of the adverse report, to bring into Camp Adair additional vehicles, and (3) authorized the Army officers to contract with the respondent for the operation of the vehicles which they had brought to the camp. Since the Army owned and operated Camp Adair, it could have denied the respondent access to the camp if the respondent had refused to operate the Government-owned vehicles.

The record shows that the respondent would not have been permitted to continue its Camp Adair service if it had refused to sign the Government lease and operate the Government busses. The contract which it signed with the appellant June 16, 1942, forbade it to "use busses of a third party" in its Camp Adair service and contained no exception to that prohibitory clause; at least none which is expressed. But when that contract was signed the Army officers had not availed themselves of the power conferred by 56 Stat. 1024, and the respondent could perform its contract with the appellant. But after the Army officers and the Office of Defense Transportation had pursued the course permitted by 56 Stat. 1024, the respondent was disabled from performing its contract with the appellant. It is true that the statute did not force the respondent to sign the Government lease and accept the Government vehicles, but had the respondent become recalcitrant it would have been denied access to Camp Adair. Thereafter it could not have entered the camp without becoming a trespasser and violating Army regulations. In other words, it could not have performed its contract with the appellant without committing unlawful acts.

*Roxford Knitting Co. v. Moore & Tierney, Inc.,* 265 Fed. 177, 11 A. L. R. 1415, cert. den. 253 U. S. 498, and the instant case have many features in common. In the Roxford case the plaintiff was a manufacturer of underwear which had contracted to deliver to the defendant a quantity of its goods. Before the contract was fully performed World War I developed and a member of the Advisory Board of National Defense wrote to the plaintiff a letter in which he stated that the Government was in need of a large quantity of underwear and asked how much the plaintiff could supply. The letter continued:

> "I would request you not to write me that you are sold up and cannot furnish any of these goods. I am aware that this condition prevails with every one. * * * It is not the committee's intention to place the whole burden on any one mill, but to divide it according to production, and I would therefore request you to give this your prompt attention and advise me promptly how much of this it will be your pleasure to take, and at what prices."

The plaintiff proposed to furnish 10,000 dozen suits, but the official aforementioned increased the quantity to 12,000 and sent the plaintiff a contract for 12,000 dozens which it and the Government signed. Shortly the plaintiff accepted Government orders for three additional quantities and contracts covering them were signed. As a result of this situation, the plaintiff was unable to complete performance of its contract with the defendant and the latter refused to pay for the goods it received before the plaintiff became engrossed with the Government contracts. The amount was $14,090.08. The decision under review was based upon an action instituted by the plaintiff to recover that sum. The plaintiff claimed that, notwithstanding the polite

language above quoted and the fact that its relation with the Government was expressed in the form of contracts, its real relation with the Government was compulsory and not contractual. The governmental orders were authorized by the National Defense Act which empowered the President in time of war to place orders for needed products and made the orders obligatory. A refusal to comply with the requirements of the act was a felony. The court was required to determine whether the orders which the representative of the Advisory Board of National Defense sent to the plaintiff were, in fact, orders, that is, commands, within the contemplation of the National Defense Act or whether they were ordinary voluntary contracts. The decision said:

"* * * There is not a word in these contracts to show that they are commandeering orders, or were to be regarded as such. Neither is there anything in the record to show that the plaintiff, prior to or at the time of the execution of the contracts, was informed by any one that these writings embodied commandeering orders. * * *

"* * * The statutes do not say that all contracts made with the government in a period of national emergency are to have precedence over civilian contracts."

The court held:

"At the time these 'orders' were given to the plaintiff it is well to remember that all the conditions which justified a commandeering order existed. * * *

"And when a manufacturer is given to understand that he is required to supply certain goods to the government of the United States, and is told that he has no option to decline to comply, we are satisfied that as to those goods an 'order' has been placed or received, within the spirit and intent and

the letter of the statute, whether the authoritative direction is written or oral, and notwithstanding the fact that the parties actually come to an agreement in what has the form of a contract. Substance is not to be sacrificed in such cases to form.''

The court held that the government ''order'' absolved the plaintiff from performance of its contract with the defendant and affirmed the decision of the District Court in favor of the plaintiff. The District Court, in determining whether or not the polite language which the Advisory Board of National Defense employed in its approach to the plaintiff was compulsory, expressed itself in language (250 Fed. 278) which has been frequently quoted. We quote:

''* * * Nothing could be said in reply to this, unless it was to protest and plead prior contracts with outside parties; but this in substance and effect had been forbidden as an excuse in the very beginning. As stated, I cannot doubt that if thereafter, and before the execution of a formal agreement, the plaintiff had refused or declined to undertake the performance of this government requirement, especially the navy requirement, it would have been told that by what had been said and done orders within the meaning of the acts of Congress in question had been placed, and that such orders so placed must be complied with. I do not think it was necessary for the plaintiff to put itself in a position of seeming unwillingness to aid the government, or of being recalcitrant. Nor do I think it was necessary for the government to say: 'This is a command, which must be obeyed, and given under the National Defense Act and Navy Appropriation Act'.''

In Dodd, Impossibility of Performance of Contracts Due to Wartime Regulations, 32 Harv. Law Rev. 799, it is said:

''No doubt under ordinary conditions it would be the duty of a producer to let nothing stand in

the way of performance of his solemn engagement short of actual compulsion by authority of law, but, under the peculiar conditions existing during the war, a refusal to act as requested by the executive until actually compelled to do so would have merely subjected the person refusing to the imputation of obstructing the government by a failure readily to cooperate with it without in any way benefiting the other party to the contract. It would seem therefore that a court is taking an entirely artificial and unrealistic position in holding that a practice deliberately adopted by the executive and enforceable through the exercise of powers granted by the legislature will not be treated by the judiciary as governmental action which private citizens are justified in obeying. The refusal by the courts so to treat it will result, from the standpoint of defendants, in protecting only the unusually cautious and the unusually recalcitrant, and on the side of plaintiffs, in permitting the recovery by those few consumers only who had so little regard for the necessity of cooperation with the government as to refuse to acquiesce in such cooperation by the persons with whom they had made contracts.''

In *Metropolitan Water Board v. Dick* (1917), 2 K. B. 1, affirmed (1918) A. C. 119, a contractor was constructing a large reservoir for a municipality when World War I broke out, and the contractor was ordered by the Ministry of Munitions to cease work. The municipality, believing that the contract was still in effect, instituted the action under review. The court held that further performance was rendered unlawful and that the contractor was absolved from the construction agreement.

In *Wischhusen v. American Medicinal Spirits Co.*, 163 Md. 565, 163 Atl. 685, the defendant was a distiller of intoxicants and the plaintiff was an expert in the

manufacture of whisky. The defendant could not operate its plant without a government permit. While an application for a permit was pending, the defendant hired the plaintiff for one year. A month later it discharged him and he thereupon instituted the action under review, claiming breach of contract. Immediately before the defendant dismissed the plaintiff the Government notified the defendant that the plaintiff was "unsatisfactory to the Government for the reason it is believed he is not trustworthy or competent." It added that no permit would issue until the position was "filled by one who is entitled to the full confidence of the Government." In holding that the Government's refusal to issue a permit absolved the defendant from its contract with the plaintiff, the court said:

"The general rule with respect to contracts is generally stated to be that, when the impossibility of performance arises after the formation of the contract, the failure of the promisor to perform is not excused, whether such impossibility was absolute or relative, or whether owing to the fault of the promisor or not, upon the theory that, if the promisor makes his promise unconditionally, he takes the risk of being held liable even though performance should become impossible by circumstances beyond his control. * * *

"The unfair consequences of this rule resulted in exceptions when the impossibility arises (1) either from a change in domestic law or by an executive or administrative order; (2) or when the thing, whose continued existence is essential to the performance of the contract, is destroyed without fault of either party to the contract; (3) or the contract is for the personal services of the promisor who, without his own default, becomes physically incapacitated or dies. * * *

"The present law on the subject is formulated in the Restatement of the Law of Contracts by the

American Law Institute, vol. II, p. 852, § 458, 'Supervening Prohibition or Prevention by Law': 'A contractual duty or a duty to make compensation is discharged, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty, where performance is subsequently prevented or prohibited (a) by the Constitution or a statute of the United States, or of any one of the United States whose law determines the validity and effect of the contract, or by a municipal regulation enacted with constitutional or statutory authority of such State, or (b) by a judicial, executive or administrative order made with due authority by a judge or other officer of the United States, or of any one of the United States'."

In *Helena Rubinstein, Inc. v. Charline's Cut Rate, Inc.*, 132 N. J. Eq. 254, 28 Atl. 2d 113, the court said:

"The mandate of the Emergency Price Control Act and the General Maximum Price Regulation Bulletin # 1 issued by the Price Administrator is clear and must be held to apply 'regardless of any contract or other obligation.' Where, as here, a conflict arises between a so-called Fair Trade contract or schedule made under the Fair Trade Act and regulations duly promulgated by the Federal Price Administrator, the Regulations must control."

We shall analyze the facts and the authorities no further. We are satisfied that a relationship which is expressed in contractual form can be found to be compulsory, if such is its true nature. We are also satisfied that when a government agency requires a person, in time of warfare, to supply the Government with supplies or services which it needs, and when the situation is such that a rejection of the demand will subject the party to a penalty or sanction, his submission to the demand cannot be deemed voluntary. The Army officers

and the Office of Defense Transportation were authorized by law to demand that the respondent operate the Government' vehicles and they could have imposed grievous sanctions had the respondent rejected the demand. For instance, it will be recalled that although the respondent had on file with manufacturers orders for many vehicles, it could obtain none. The trial judge remarked:

> "The United States Government did supersede anything that was on order and take it over themselves. I can't understand that the parties contemplated that."

In other words, the respondent, like all other carriers, was virtually dependent upon the Office of Defense Transportation for a continuance of its business. It would have been futile for it to have rejected the demands made by that agency and the officers in charge of transportation at Camp Adair.

■ We are convinced that although a contract contains no provision which absolves the promisor from performance if a change in the law—statutory or administrative—occurs and prohibits further performance, the change terminates the agreement. Such a change took place in this case.

We think that the trial judge was justified in finding that although the relationship between the respondent and the Government was expressed in the form of a voluntary contract, its real nature was compulsory.

■ The contract between the appellant and the respondent, as we have said, contains no provision which excused the respondent from its promise not to use the vehicles of third parties, yet we are satisfied that it was absolved from that agreement when the Govern-

ment insisted that the respondent use its busses or stay out of Camp Adair.

The judgment of the Circuit Court is affirmed.

HAY, J., did not participate in this decision.

KELLY, J. (Dissenting.)

As I view it, the first so-called finding of the trial court quoted at the outset of this court's opinion is not a finding of fact. A conclusion without a basis of fact upon which it may be founded is a nullity.

The second finding is contradicted by the only testimony in the record on the subject.

In my opinion, to take an agreement to which the plaintiff was not a party and which was voluntarily executed by the defendant and the Government, and by its terms attempt to prove that it was executed under governmental coercion and hence is a complete release and exoneration of all obligation or duty under the terms of a contract with plaintiff solemnly executed in writing nine months and twenty days theretofore, is extending an invitation and opportunity to all contracting parties to avoid the obligation of their solemnly executed contracts by merely making a different contract with a third party and reciting therein statements that, if true, would excuse the performance of or compliance with the contract first executed.

As I view it, the question is not whether the agreement between defendant stages and the Government contained or did not contain certain statements. Certainly, one not a party to it, and in this case the plaintiff was not a party to defendant's contract with the Government, should not be charged with its terms or the statements contained therein. The question is whether coercion or duress on the part of the Govern

ment was employed to force defendant to enter into the contract. The representative of the Government affirmatively testified that there was no such or any coercion.

In my opinion, it makes no difference whether this is a proceeding at law, or one that should be governed by the rules of equitable procedure. I think that, because the only testimony in the record is to the effect that there was no coercion, neither a court of law nor a court of equity has any right to release, discharge or acquit defendant of its duty to perform either its expressed or implied covenants as reflected in the contract with plaintiff.

There is affirmative testimony by the plaintiff himself that he understood the term "schedules" to be synonymous with the word "traffic". I can come to no other conclusion than that the representatives of the defendant were fully aware that plaintiff so understood it. I cannot conceive of any one situated as plaintiff was when his contract with defendant was executed assenting to a contract that was to be unalterably governed by the technical meaning of the term "schedules". In other words, I believe, when he signed the contract, plaintiff understood that at least five of his busses would be given preference over all other conveyances used in local traffic between Corvallis and Camp Adair, except only busses owned by plaintiff. I am also firmly convinced that the representatives of defendant knew that plaintiff so understood the contract. There is no express denial in the record of that fact.

The argument based upon the testimony of experts as to the technical meaning of the word "schedules" fails to convince me that any one with a modicum of common sense finding himself in the situation of plain-

tiff seeking and requiring employment for his five busses would have signed away his sole and only objective and purpose and thereby voluntarily put himself wholly at the mercy, whim or caprice of defendant's director of cars to determine what, if any, employment he might have.

As I understand the opinion of this court, it is to the effect that despite the fact that the only testimony in the record in that respect is testimony given by the Government's representative affirmatively stating that there was no coercion or duress attendant upon the execution of the contract by defendant stages with the Government, nevertheless, the trial court was justified in holding that there was such coercion or duress; and that because of such coercion and duress, the defendant stages was exonerated and relieved from performing not only the express terms of its contract with plaintiff, but also with its implied covenants to cooperate with plaintiff in supplying plaintiff the means by which plaintiff would be enabled to receive the benefits and avails therein granted to him.

With due respect to all who differ, I cannot concur with either of those pronouncements.

The opinion of the court cites and quotes from the case of *Roxford Knitting Co. v. Moore & Tierney,* 265 Fed. 177, 11 A. L. R. 1415. In that case, it is shown that under the provisions of an act of Congress, the president was empowered in time of war or national emergency by proclamation to place ''orders'' for war supplies and such orders were made obligatory on any person to whom such orders were given. The congressional act provided that such orders should take precedence over all other orders and contracts theretofore placed with such persons. There were four separate orders given to plaintiff. Upon the fulfill-

ment of those orders plaintiff based its right to recover for goods furnished defendant in part performance only of a contract with defendant and the court upheld plaintiff's recovery. In the case at bar, there is no controlling act of Congress even suggested and no presidential order based thereon. Instead thereof, as stated, there is affirmative testimony by the Government representative that there was no coercion.

The case of *Wischhusen v. American Medicinal Spirits Co., Inc.,* 163 Md. 565, 163 Atl. 685, also cited in the opinion, is a case wherein defendant, a distiller of intoxicants, applied for a permit to operate its plant. Plaintiff, Wischhusen, had been hired for a year by defendant as an expert in the manufacture of whiskey. A month after hiring plaintiff, defendant discharged him because the Government notified defendant that plaintiff was unsatisfactory to the Government for the reason it believed that he was not trustworthy or competent and further the Government gave defendant notice that no permit would issue to defendant allowing him to continue the operation of his distillery until the position was filled by one who is entitled to the full confidence of the Government. Hoping to be forgiven for saying so, I think duress, coercion and governmental authority in that case was doubly distilled. As I view it, that case has no relevancy to the facts in the case at bar.

Neither has the quoted statement from that case of the four recognized exceptions to the rule that where impossibility of performance after the formation of a contract the failure of the promisor to perform is not excused, nor has the quotation there made from Section 458, p. 852 of Vol. 2 of the Restatement of the Law of Contract dealing with prevention of performance (a) by the Constitution or Statute of

the United States or by the constitution or statute of any one of the United States or by a municipal regulation, or (b) by judicial, executive or administrative order. None of these interdictions is even remotely suggested by its counsel as affecting the action of defendant in the instant case.

The same may be said of the quotation from the case of *Helena Rubinstein, Inc. v. Charline's Cut Rate Inc.*, 132 N. Y. Eq. 254, 28 Atl. 2d 113, with reference to the mandate of the Emergency Price Control Act.

I fail to find from the testimony that the United States required defendant to lease and use the government owned semitrailers. The most that may be said in that regard is that there is testimony in the record that such requirement would have been exacted if defendant had declined to contract for the use of the seventeen semitrailers of the Government; but actually no such requirement was communicated to defendant by the representatives of the Government.

Mr. F. E. Landsburg, whose duties in connection with the Office of Defense Transportation included the rationing of motor vehicles and also the handling of transportation emergencies, which arose during the time involved in this case, testified as a witness for defendant.

On cross-examination concerning the contract by virtue of which the seventeen semitrailers of the Government were used by defendant, Mr. Landsburg was asked:

"Q Was any compulsion exerted by your office on Oregon Motor Stages to take this contract?

A No, I can't say any compulsion was exercised directly because we were very much opposed to using compulsion in the first place, and it wasn't necessary in the second place. In other words, to

put equipment there, the command was able to make a satisfactory contract with Oregon Motor Stages, and they accepted it, and that dropped us out of the picture, and we only checked to see if it was going all right. If Oregon Motor Stages said they wouldn't take it, there would have been compulsion; we would have had to come in and authorize another carrier to serve the camp.''

Continuing Mr. Landsburg's cross-examination, the following questions were asked and answers thereto were given as follows:

''Q That compulsion would have consisted in your authorization to another carrier to rent those busses and perform this same service?

A Not rent the busses, but enter into a contract to operate the busses.

Q The compulsion would have consisted in giving another carrier the right to do what you first extended to the Oregon Motor Stages?

A That's right.

Q No more and no less?

A We would probably have issued a certificate to that carrier to serve the camp in addition to having them run the equipment.

Q The effect on Oregon Motor Stages if they had not wished to take the contract would have been the result of getting a competitive carrier for that particular business?

A That's right, for that is a military reservation and the command could have said to that company, 'You will not come into this camp—you will stop entry'.

Q Do you know whether the Command or your office ever said that to Oregon Motor Stages?

A No, they didn't say it to Oregon Motor Stages, but they did say it to the Northwest Coast Lines at Lewis.

Q But in negotiating this particular matter, there was no such threat made, is that right?

A That's right.''

Mr. Carl Wendt, transportation engineer for defendant, was called as a witness for defendant, and just before his cross-examination was concluded, he testified as follows:

"Q But in entering into this particular contract, do you know of any threats or any compulsion that were taken toward Oregon Motor Stages to cause it to enter into this contract?

A None whatsoever. The only compulsion that entered into it was that we felt, as all other transportation felt, we must do as good a job as possible with what equipment they had available."

As to the contention made that the United States was not a third party within the meaning of and as understood and interpreted by the plaintiff and defendant in entering into the agreement of June 16, 1942, I think that it was not until April 15, 1943, that the first contract between the Government and defendant was executed. Its terms could not possibly have been interpreted or understood by either plaintiff or defendant on June 16, 1942. Moreover, in the first government contract, both the government representative and defendant herein are designated as parties. I quote: "Now therefore, the *parties hereto* do mutually agree as follows:" (Italics supplied.)

On April 5, 1944, a second contract, also designating the Government and defendant as parties thereto, was executed by said parties.

There is a well known principle applicable to contracts such as this imposing a duty upon the party who employs another to serve him. That is, the duty to cooperate with the one employed and not to prevent or hinder him in the performance of his part of the contract.

\* \* \* "In any case where the plaintiff's per-

formance requires the cooperation of the defendant, as in a contract to serve or to make something from defendant's materials or on his land, the defendant, by necessary implication, promises to give this cooperation and if he fails to do so he is immediately liable though his only express promise is to pay money at a future day.'' Excerpt from Section 1318, Vol. 5, Williston on Contracts (Williston Thompson Ed.) p. 3717, citing Rest. Contracts, Section 315; Lovell v. St. Louis Mut. L. Ins. Co. 111 U. S. 264, 274, 4 Sup. Ct. 390, 28 L. Ed. 423; Edwards v. Slate, 184 Mass. 317, 68 N. E. 342; Tournier v. National Provincial Bank, (1924) 1 K. B. 461, 12 Brit. Rul. Cas. 1021.

In the same section, it is said:

''Indeed, there is generally in a contract subject to either an express or an implied condition an implied promise not to prevent or hinder performance of the condition.''

In the case at bar, it was only by cooperation with defendant that plaintiff's five busses could all be used before those of any other party were employed in transporting passengers from Camp Adair to Corvallis and from Corvallis to Camp Adair. As I read the record, defendant failed to accord plaintiff that cooperation.

Instead of cooperating with plaintiff to the end that its agreement to accord its traffic patronage between Corvallis and Camp Adair to the capacity of five of plaintiff's busses before employing the service of any third party's motor vehicles, defendant gave preference to the semitrailer service; and, because technically such service was known to the transportation guild as local schedules between Albany and Corvallis by reason of defendant's action in routing the semitrailer through Camp Adair rather than merely to it, defendant now insists that it fully complied with

its agreement to give the specified preference to plaintiff's five busses, namely, preference in regard to traffic upon local schedules between Corvallis and Camp Adair.

By analogy, the doctrine of an English case, cited by Williston, seems to me to be in point. This case was decided 120 years ago. There, the defendant promised to make a lease to the plaintiff as soon as he should become possessed of the property which was then under lease to a third party. The defendant, before the expiration of the prior lease, executed another to the same lessee thereby preventing possession reverting to him at the expiration of the previous lease. *Ford v. Tiley,* 6 B. & C. 325.

In principle, routing the seventeen semitrailers from Corvallis through Camp Adair to Albany and from Albany through Camp Adair to Corvallis to avoid giving the promised preference to plaintiff in respect to traffic between Corvallis and Camp Adair, is analogous to Tiley's execution of a second lease to the third party in possession under a former lease in order to avoid compliance with the agreement Tiley had made with Ford to lease Ford the premises as soon as he, Tiley, should become possessed of the property.

The English court found for plaintiff and Williston approves its holding.

> \* \* \* "In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made, and to refrain from doing anything which will destroy or injure the other party's right to receive the fruits of the contract." 17 C. J. S., Subject: Contracts, pp. 778-779, Section 328,

544

citing marginal note 41 and 1947 Cumulative Annual Pocket Part; Uproar Co. v. National Broadcasting Co., C. C. A. Mass. 81 F. 2d 373, modifying D. C. 8 F. Supp. 358; Kirke LaShelle Co. v. Paul Armstrong Co. 263 N. Y. 79, 188 N. E. 163; Parev Products Co. v. I. Rokeach & Sons, D. C. N. Y. 36 F. Supp. 686, Affd. C. C. A. 124 F. 2d 147; Mechanical Ice Tray Corp. v. General Motor's Corp. C. C. A. N. Y. 144 F. 2d 720; Beuttas v. U. S. Ct. Cl. 60 F. Supp. 771; Universal Sales Corporation v. California Press Mfg. Co. 29 Cal. 2d 751, 128 P. 2d 383; Brawley v. Crosby Research Foundation, 73 Cal. App. 2d 103, 166 P. 2d 392; Price v. Spielman Motor Sales Co. 26 N. Y. S. 2d 836, 261 App. Div. 626; Halstead v. General Ry. Signal Co. 51 N. Y. S. 2d 372, Affd. 52 N. Y. S. 2d 660, 268 App. Div. 1060; Pappas v. Grist, 223 N. C. 265, 25 S. E. 2d 850; Haley v. Bradley, 17 Wash. 2d 775, 137 P. 2d 505, 146 A. L. R. 859.

See also: O'Neil Supply Co. v. Petroleum Heat & Power Co. 280 N. Y. 50, 55, 56, 19 N. E. 2d 676, 678, 679; Mansfield v. N. Y. Central R. R. Co., 102 N. Y. 205; 6 N. E. 386; M. L. Ryder Building Co. v. City of Albany, 176 N. Y. S. 456, 187 App. Div. 868; Del Genovese v. Third Ave. R. Co., 43 N. Y. S. 8, 13 App. Div. 412.

To be as frank as I can without appearing to be offensive, I find absolutely no testimony in this record to the effect that defendant was compelled to execute its contract with the Government. There is nothing that supports the attempted justification of defendant in failing to establish local schedules in order that its contract with plaintiff could not possibly be misconstrued. There is nothing in the record that supports the suggestion that plaintiff's services or the use of plaintiff's busses were deemed inimical to the interest or safety of the Government. In a word, I think that defendant's attempted defense has wholly failed.

Certainly its defense of coercion is not supported by substantial or any testimony. The implied covenant attendant upon all contracts, that there must be mutual cooperation on the part of both parties, has been shown by this record to have been violated by defendant. If the term "local schedules" is to be held to be controlling, there certainly was an implied covenant that defendant would cooperate by securing the establishment of such schedules. This defendant failed to do. Moreover, I cannot for one moment get my own consent to the suggestion that where the contract in suit was executed by plaintiff and defendant, plaintiff understood that the term "local schedules" restricted his right to participate only in the transportation of passengers pursuant to local schedules, nor can I persuade myself to think that the representatives of defendant were not fully aware of the construction plaintiff actually gave to that term.

Taking it by its four corners and considering it in its entirety, it is impossible for me to construe the contract in suit between plaintiff and defendant stages to mean anything else than that as to at least five of his busses plaintiff was granted a preference with respect to all local traffic between Corvallis and Camp Adair not served by busses owned by defendant at the time the contract was executed. To render effective this preference so granted, if it became necessary to establish and maintain local schedules between those two points and convey all of its local traffic pursuant to such local schedules only, there was an implied covenant that defendant would take that course.

There is not even a scintilla of testimony in the record that defendant complied with that implied covenant; but, on the contrary, the defendant asserts

that it had a right to and did carry such local traffic in accordance with other schedules, namely, through schedules from Albany through Camp Adair to Corvallis and *vice versa,* and in that way plaintiff's busses were deprived of the preference granted plaintiff by the contract in suit. This, in my opinion, was a flagrant breach and violation of the implied covenant necessarily attendant upon the express grant by defendant to plaintiff of said preference; and, because of such breach, plaintiff was and is entitled to such damages as he sustained thereby.

I think the judgment and decree of the circuit court should be reversed and this cause should be remanded for an accounting.

For the foregoing reasons, I dissent.